JAMES C. LINDSAY vs. THOMAS B. GUNNING, JR., AND
OTHERS.

New Haven and Fairfield Cos., April T., 1890. ANDREWS, C. J., CAR-
PENTER, LOOMIS, TORRANCE and F. B. HALL, Js.

The statute with regard to a builders' lien, (Gen. Statutes, § 3018,) provides
that "every building in the construction of which any person shall
have a claim for materials furnished or services rendered shall, with
the land on which the same may stand, be subject to the payment of
such claim; and said claim shall be a lien on such land, building and
appurtenances." The owners of a farm of three hundred and fifty
acres employed the plaintiff to erect extensive barns, stables and other
farm buildings upon it. The buildings were adapted to and intended
to be used with the entire farm and would be greatly reduced in value
if they were detached in ownership from the entire farm. Held that
the plaintiff's lien covered the whole farm.

And held that such lien was good not only against the original proprietors
of the farm who had procured the erection of the buildings, but
against creditors and subsequent incumbrancers.

The rule in determining what quantity of land should go with farm build-
ings in ascertaining the extent of the builders' lien for constructing
them, is to ascertain the quantity of contiguous land that it was in-
tended should be used with them and to which they are needful or
useful.

[Argued April 23d—decided July 10th, 1890.]

SUIT to foreclose a builders' lien ; brought to the Supe-
rior Court in Fairfield County and heard before *Thayer, J.*
The court made the following finding of facts :—

During the year 1887 the defendants Thomas B. Gun-
ning, Jr., and Christine L. Gunning, then husband and wife,
purchased from different owners a number of tracts of land
situated in the town of Wilton, with the intention of throw-
ing them all into one large farm to be owned and operated
by them jointly as a stock and dairy farm. The premises
thus purchased included the C. Marvin farm, the T. K. Hub-
bell farm, a portion of the J. W. Hubbell farm, the Haynes
farm, the Brown lot, and the C. C. Gregory land, which
tracts together make up the three hundred and fifty acre
tract described in the certificate of the lien which this suit

is brought to foreclose.   Other lands, close to but not adjoining these, were purchased, and it was their intention to purchase and consolidate with the lands described some seven hundred acres of adjacent lands.

There were dwelling houses, barns and other ordinary farm buildings upon the Marvin and Haynes farms and a barn upon the T. K. Hubbell farm.   The buildings formerly used in connection with the J. W. Hubbell farm were not purchased by the Gunnings.   Upon the Gregory land there was an old sawmill, with appurtenant water privileges.

The tracts thus mentioned make one contiguous tract, and all are situated on the westerly side of the Danbury and Norwalk highway, except the Marvin farm, through which the highway runs from north to south.   A portion of this farm, consisting of about thirty acres, is on the easterly side of the highway opposite the remaining portion of the farm.

There are no buildings upon this thirty acres except a small shop which was not in use when the Gunnings purchased the farm, but which was repaired by them and used for stabling cows.   This thirty acres is divided into two parts by the Norwalk river, which flows through it from north to south.   It is low meadow and pasture land elevated but little above the level of the highway.

On the westerly side of the highway and adjacent thereto, extending from north to south, is a strip of similar meadow, thirty or forty rods in width.   West of this strip the land rises abruptly to a height of about one hundred and fifty feet, the ascent being so steep as to make passage up and down impracticable except in the central and southern portions of the tract.   In the northerly part the bluff by reason of its steepness is useless for any other purpose than for woodland, to which, to the extent of about ten acres, it is devoted.   In the central part the ascent is less steep, and a pentway here extends across the meadow from the highway and passes up a ravine to the high lands west of the bluff.   South of this pentway for a considerable distance, and north of it for a short distance, the hillside is so steep as to make

the lands useless for other purposes than pasturage. At the southerly end of the tract the ascent from the meadows to the high lands to the west is less steep, and another path connects the low lands of the Haynes farm with the high lands in the rear.

West of the bluff the land ascends gradually to the westerly boundary of the tract and consists of pasture and meadow or arable land, and has always been used in connection with the meadow land adjoining the highway belonging to the different farms under the same ownership.

The lands thus described were, at the time of their purchase by the Gunnings, divided up into numerous lots by stone walls and other fences, in the manner common to Connecticut farms.

It was their intention to remove all or most of the interior fences, and by new fences to divide the consolidated farm into new and much larger lots; to erect thereon a mansion house, and extensive farm buildings, sufficient to accommodate a herd of at least two hundred cows, and to devote the farm to the purpose of pasturing and raising fodder for such herd of cows and other incidental stock and blooded horses; and, after the contemplated buildings should be erected, to remove all the old buildings from the farm. While the new buildings were being constructed the old buildings were used in connection with the land.

For the purpose of consolidating the several tracts of land purchased by them, Mr. and Mrs. Gunning, on the 5th of June, 1888, deeded their respective interests therein to Alfred E. Austin, one of the defendants, who at once re-deeded to them in equal, undivided portions, all the tracts so consolidated by being conveyed to him. The deeds by which these conveyances were made were duly recorded.

On the 16th of July, 1888, Mr. and Mrs. Gunning and the plaintiff entered into a written contract, by which the plaintiff was to erect a creamery, cow stables, silo and barn upon the farm, according to certain specifications, for $18,400. The plaintiff fully performed his part of the contract. He commenced to render the services and furnish

materials under the contract, on the 16th day of July, 1888, and ceased to render such services and furnish such materials on the 10th day of December, 1888.

On the 24th of December, 1888, the plaintiff subscribed and swore to the following certificate, and caused the same to be recorded : " This is to certify that the subscriber has a lien, pursuant to the statutes in such case provided, upon the following described premises situated in the town of Wilton, in the county of Fairfield, and state of Connecticut, to wit: [describing the tract, and stating that it contained three hundred and fifty acres.] Said lien is for the security of a claim now due to the subscriber from Thomas B. Gunning, Jr., and Christine L. Gunning, for materials furnished and services rendered in the construction of certain buildings situated upon said premises and known as a creamery, cow stables, silo and barn, constructed as one undertaking by agreement with the said Thomas B. Gunning, Jr., and Christine L. Gunning, the owners of the premises aforesaid. The amount of said claim is $11,557.50, with interest on $4,500 of said sum from November 1st, 1888, and on the balance from December 10th, 1888. The buildings above referred to are situated but a short distance apart and near the center of that portion of the premises which is first described. The premises above described belong to a single consolidated farm, for the use of all of which the said buildings were constructed ; and for the proper and intended use and reasonable enjoyment of said buildings all the premises aforesaid are necessary and only reasonably convenient. The subscriber began to render services and furnish materials as aforesaid on the 16th day of July, 1888, and ceased so to do on the 10th day of December, 1888, and the commencement of this lien is the 16th day of July, 1888. In witness whereof I have hereto set my hand, the 24th day of December, 1888. JAMES C. LINDSAY."

Before entering into the contract the plaintiff went to Wilton and viewed the premises and saw the intended location of the contemplated buildings. The boundaries of the farm were then pointed out to him by Mr. Gunning, and the

intention of the Gunnings with reference to the farm and the uses to which it was to be put, and the intention to purchase additional adjacent lands, were then fully made known to him by Mr. Gunning.

The cow stable constructed by the plaintiff under the contract is a low building three hundred and fifty-one feet long by forty feet in width. It stands partly upon the original Haynes farm and partly upon the Marvin farm. It is capable of stabling two hundred cows, one hundred upon each side of a central driveway, and has a storage capacity for one hundred and sixty tons of hay. It is situated upon a plateau above the bluff already mentioned, is about twelve hundred feet west from the highway in a direct line, and is elevated about one hundred and fifty-seven feet above it.

The barn and silo are about seven hundred feet north of the cow stable, near to and south of the ravine mentioned above, and in elevation are about twenty-seven feet lower than the cow stable. The silo is a solid stone structure, with a wooden superstructure and roof, containing four silo pits thirty feet deep without side openings of any kind. It is designed for the storage of ensilage and green fodder for two hundred cows. The silo barn is about twelve feet west of the silo pits, and four and one half feet above them. It is forty by fifty feet in size and capable of storing hay and grain. It was designed to cut the ensilage by steam power in this barn before it should be placed in the pits, and when it was taken from the pits it was to be mixed and prepared for the cattle in this barn and then transferred to the cow stable by dump cars operated by steam power and cable, upon a tramway connecting the two buildings. · Such tramway has not been constructed, and the dump cars have not been provided, but a boiler to operate an engine for these purposes and also to operate an engine in the creamery was placed upon the lot near the silo barn.

The creamery is a large building, large enough to use the milk from one thousand cows. It was intended to be used in connection with the Gunning dairy, and also to furnish a market for the milk of the neighboring farmers. It is situ-

ated three hundred feet from the barn and silo, northerly, and its elevation is eighty-three feet above the highway. The creamery and steam boiler at the silo barn were furnished with water from a reservoir made by a dam across the ravine above mentioned, through which a small stream flows. The dam is five hundred feet west of the building.

It was intended by the Gunnings at one time to light these buildings by electricity generated at the water power on the Gregory land. This plan was afterwards changed, and this water power was to be devoted to the purpose of grinding grain for the stock kept upon the farm, and power for the electric light was to be furnished by the steam boiler above mentioned.

The silo and silo barn are located upon land belonging to the J. W. Hubbell farm. The creamery is upon land belonging to the T. K. Hubbell farm, and is separated from the silo and silo barn by the ravine above mentioned. Convenient use of the cow stable would necessitate the use of a part of the Brown lot, which contains about nine acres, and from which, at the nearest point, it is distant about eight feet. The original farm lot upon which the creamery was erected contained about two and one-half acres. The original farm lot upon which the silo and silo barn were erected contained about four acres. The original farm lots upon which the cow stable was erected contained together about twelve acres, the lot on the Haynes farm containing about four and one half acres, that on the Marvin land about seven and a half acres. The cow stable, silo and silo barn and creamery are all situated south of the pentway above mentioned and near the middle of the three hundred and twenty acre tract. Driveways have been built by the Gunnings connecting all these buildings with the pentway and with each other.

About November 7th, 1888, Mr. Gunning, owing to family difficulties, abandoned his family and left the state, and their plans as originally made and hereinbefore set forth have not been fully carried out. None of the buildings are completed and ready for use. The cow stable requires to be

floored or concreted over its entire floor space, both stables and driveways; approaches to all the doors remain to be constructed, and bars and chains for fastening the cows and fences for cow yards are needed before the same will be fit for use. The silo barn requires expensive approaches, and the silo requires a hoisting apparatus for storing in and removing from the pits the ensilage designed to be stored therein. The expense of thus completing the buildings will be considerable. No part of such expense was to be borne by the plaintiff.

In pursuance of their original scheme and for the purpose of getting stone for use in the foundation of the buildings, the Gunnings removed a large number of the interior fences, some wholly and some in part, and so far as the fences thus removed were of stone, as they mostly were, used the stone in the construction of the silo pits and the foundations of the cow stable, silo barn and creamery. The removal of the fences opened into one tract, undivided and unseparated by fences, about one hundred acres of land situated nearly in the middle of the three hundred and fifty acre tract. The tract thus thrown open is of very irregular shape and contour, and includes parts of the Haynes farm, parts of the Marvin farm, parts of the J. W. Hubbell farm, parts of the T. K. Hubbell farm, and all of the Brown lot. In this one hundred acre tract all the buildings constructed by the plaintiff stand.

There is necessary to the reasonable use of the cow stable for the purpose of stabling cows therein, so much land surrounding it as would be included within straight lines drawn, and produced to meet each other, ninety feet from and parallel with the outside lines of the building. The land thus included is necessary for cow yards, manure yards and approaches to the building. The Gunnings intended to fence in such cow yards and manure yards. There is necessary to the reasonable use of the silo and silo barn for storage purposes and for the purposes of preparing and mixing fodder as hereinbefore stated, one half acre of land surrounding the buildings, including that upon which they stand. There is

necessary to the reasonable and convenient use of the creamery one half acre of land surrounding it, including the land upon which it stands. There is also necessary to the use of the buildings a right of way to each over the pentway and driveways built by the Gunnings. For operating the buildings in connection with each other for the purposes aforesaid, the lands surrounding them as above, together with said right of way and the intervening land, making a tract of about eight acres, is necessary and reasonably convenient. This tract has at present no defining marks or physical boundaries.

The buildings are each larger than is required for use in connection with the consolidated farm of three hundred and fifty acres. The three hundred and fifty acre tract is not capable of producing the amount of fodder which two hundred cows require and which the silo and new barns are capable of storing. If adjacent lands sufficient to supply the deficiency were acquired as intended by the Gunnings, the old buildings removed, and the whole used for the purposes and upon the scale designed by them, the new buildings would be necessary and reasonably convenient for use in connection therewith, for the purposes for which they were intended. With the old buildings upon the premises as they now are, the new buildings are neither necessary nor reasonably convenient for use in connection with the three hundred and fifty acre tract, operated according to the rules of husbandry in vogue among Connecticut farmers.

There was due to the plaintiff upon the contract at the time the certificate was lodged for record, $10,400, with interest on $4,000 thereof from the 1st day of November, 1888, and on the balance from the 10th day of December, 1888. There was also due him for extras $665, for carting materials, $292.50, and for damages for a delay caused by the Gunnings, $200. This last sum was agreed upon by the parties as the amount due for such damages. The whole amount so due the plaintiff was $11,557.50, besides the interest.

The consolidated farm with all buildings thereon is worth

$17,000. · The new buildings, with eight acres of land sur- . rounding them, are worth $4,000. The one hundred acre tract thrown open by the removal of fences as aforesaid, is worth, apart from the buildings, about twenty-five or thirty dollars per acre. The land west of the highway is sufficient to secure the plaintiff's claim. During the trial it was stated by the plaintiff, but not proved, that the architect and other mechanics claimed liens upon the premises prior to the plaintiff. This was not denied or admitted by the defendants. If such liens, to the amount claimed, exist, the entire farm is no more than sufficient to secure the plaintiff's claim.

The defendant Austin, on the 22d day of August, 1888, took a mortgage of the consolidated farm, together with other lands of the Gunnings, to secure his endorsement of their joint note for $7,500, on which note the sum of $7,000, with interest, remains overdue and unpaid, and payment thereof has been demanded of Austin. At the time he took the mortgage he knew of the plans of the Gunnings, of the buildings then in process of erection, and of the purposes to which they intended to devote the farm.

On the 19th of September, 1888, the defendant William Lawler attached the interest of Thomas B. Gunning, Jr., in the Marvin farm, a portion of the three hundred and fifty acre lot, in an action now pending.

On the 28th of November, 1888, the Chemical National Bank, another defendant, attached the interest of Mrs. Gunning in the premises, together with other lands, in an action demanding $3,000 damages, now pending in court; and on the 5th day of January, 1889, in another action now pending against Mrs. Gunning, claiming $9,000 damages, the bank again attached Mrs. Gunning's interest in the same property.

After this action was commenced and more than sixty days after the attachments mentioned were made, Christine L. Gunning made an assignment in insolvency of all her property to Clarence B. Coolidge, who was duly appointed trustee of her estate, accepted the trust, and is now acting as such trustee and appeared and defended in this action.

The plaintiff offered no evidence to show, nor did he attempt to show, what amount of land less than the whole farm was necessary and reasonably convenient for the uses of the buildings, either separately or in connection, for the purposes for which they were built; but the defendants offered such evidence, which was admitted, for the purpose of showing that the description of the premises in the certificate was grossly and inexcusably inaccurate, and that therefore the certificate was void.

The plaintiff's counsel upon the trial claimed that all the contiguous land of the owners of the buildings was subject to the lien; that if this was not so, then enough of the contiguous land to satisfy, together with the buildings, the amount due, was covered by the lien; that having filed his certificate in good faith, after a full and fair investigation of the facts, believing that the lien covered the whole tract, and that it was necessary to cover the whole tract by the certificate in order to secure his claim, the whole tract, or so much as the court should find to be needed to satisfy his claim, was subject to the lien and liable to foreclosure;· that if this was not so, then at least so much of the land as was necessary or reasonably convenient for the use of the buildings so as to make them as profitable, useful and beneficial as possible under the circumstances, or as intended by the owners, was included in the lien; that this would certainly cover all the land which was intended to be tributary to them in carrying out the purposes for which they were built, and therefore would cover the three hundred and fifty acres; that upon the facts the lien would cover all the land described in the certificate; but that if more land than so much as might lawfully be included therein was described in the certificate in good faith, the lien was not thereby rendered invalid, but would hold good upon so much of the land as might properly have been so included and described, which amount it was the province and duty of the court to determine.

The plaintiff further claimed that if, for any reason, a smaller extent of territory than that described in the cer-

tificate was sufficient to satisfy the requirements of the plaintiff's lien, the burden of proof was upon the defendants to show what that smaller amount was.

The court overruled these claims of the plaintiff, and ruled that his inchoate lien did not extend beyond the tract of eight acres upon which the buildings stand, and the rights of way to and from the same; that the description in the certificate of the premises subject to the lien was grossly and fatally inaccurate; and that the certificate was therefore void; and rendered judgment for the defendants. The plaintiff appealed.

*J. H. Perry* and *H. Stoddard*, for the appellants.

1. It is held by the authorities that builders' liens are of the highest equity and that the statutes governing them should be liberally construed in their favor. *Middletown Savings Bank* v. *Fellowes*, 42 Conn., 36, 50; *White Lake Lumber Co.* v. *Russell*, 22 Nebr., 126; *Montandon* v. *Deas*, 14 Ala., 33; *Trammell* v. *Mount*, 68 Texas, 210; *Edwards* v. *Derrickson*, 28 N. Jer. Law, 39; *Davis* v. *Alvord*, 94 U. S. R., 545, 547, 549; *Mining Co.* v. *Cullins*, 104 U. S. R., 176.

2. The lien should cover the entire tract of land described in the certificate. Kneeland on Mech. Liens, §§ 96–109; Lloyd on Law of Building & Buildings, § 288; Phillips on Mech. Liens, § 199–202, 258; *Bank of Charleston* v. *Curtiss*, 18 Conn., 342; *Fitch* v. *Baker*, 23 id., 563; *Hopkins* v. *Forrester*, 39 id., 351; *Stockwell* v. *Campbell*, id., 362; *Brabazon* v. *Allen*, 41 id., 361; *Hooker* v. *McGlone*, 42 id., 95; *Marston* v. *Kenyon*, 44 id., 349, 355; *Vandyne* v. *Vanness*, 5 N. Jer. Law, 485, 492; *Edwards* v. *Derrickson*, 28 id., 39, 41; *S. C.*, 29 id., 468, 473; *James* v. *Van Horn*, 39 id., 353; *Montandon* v. *Deas*, 14 Ala., 33; *Roby* v. *University of Vermont*, 36 Verm., 564; *Lauman's Appeal*, 8 Penn. St., 473, 477; *Nelson* v. *Campbell*, 28 id., 156; *McDonald* v. *Minneapolis Lumber Co.*, 28 Minn., 262; *Ex parte Davis*, 9 Rich., 204; *Kelley* v. *Border City Mills*, 126 Mass., 148; *Dean* v. *Pyncheon*, 3 Pinney, 17, 25; *Hill* v. *LaCrosse &c. R. R. Co.*, 11 Wis., 214, 227; *Parmelee* v. *Hambleton*, 19 Ill., 615;

*Tracy* v. *Rogers*, 69 id., 662; *Nat. Stock Yards* v. *O'Reilly*, 85 id., 546; *Paddock* v. *Stout*, 121 id., 571, 580.

3. If the lien cannot cover the entire farm yet the certificate is good for whatever land the lien shall be held properly to cover. Phillips on Mech. Liens, §§ 387–389; Kneeland on Mech. Liens, § 108; *Rose* v. *Persse & Brooks Paper Works*, 29 Conn., 256; *Chapin* v. *Persse & Brooks Paper Works*, 30 id., 461; *Hopkins* v. *Forrester*, 39 id., 351; *Brabazon* v. *Allen*, 41 id., 364; *Larkins* v. *Blakeman*, 42 id., 292; *Shattuck* v. *Beardsley*, 46 id., 386; *Westland* v. *Goodman*, 47 id., 83; *Kiel* v. *Carll*, 51 id., 440; *Oster* v. *Rabeneau*, 46 Misso., 595, 599; *Bradish* v. *James*, 83 id., 313, 317; *Lyon* v. *Logan*, 68 Texas, 521; *White Lake Lumber Co.* v. *Russell*, 22 Nebr., 126; *Edwards* v. *Derrickson*, 28 N. Jer. Law, 39; *S. C.*, 29 id., 468.

*S. Tweedy*, for the defendant C. B. Coolidge, trustee in insolvency of Christine L. Gunning.

1. The plaintiff seeks to foreclose a builders' lien upon a farm of three hundred and fifty acres for a balance due him for furnishing materials and rendering services in the construction of a creamery, cow stable, silo and barn upon a part of the farm, as against the owners (one of whom is insolvent, and appears herein by her trustee in insolvency), and a subsequent mortgagee and attaching creditors. His rights must depend wholly upon our statute on the subject, and should be determined by the construction given to the statute by our own numerous decisions. The wisdom and propriety of ascertaining its theory and proper construction in cases arising under it from our own decisions rather than from those of other states, are clearly recognized in *Brabazon* v. *Allen*, 41 Conn., 361, where this court says (p. 362): " As the right to liens is created by statute, the rights acquired, or whether any, in any given case, must be determined by statute. We deem it wiser, therefore, to confine our attention to the terms and spirit of our statute, and the decisions under it, rather than to be drawn aside to con-

sider the decisions of other states, whose statutes may be similar or dissimilar to ours."

2. It seems impossible to conceive how, under any circumstances, so extended a lien on such a farm could arise under our statute. The plaintiff is compelled at the outset to insist upon a most liberal construction of it. It is, however, unnecessary to notice the decisions in other states cited on this point, for the question has been definitely settled by this court, and the rule of strict construction applied, especially in cases like the one at bar, where third parties have acquired interests in the property sought to be subjected to the lien. "We cannot think that this was intended to be allowed by the statute, which, as it gives peculiar privileges to certain creditors, contrary to the general policy of our law, which favors an equal distribution of the effects of an insolvent, should as we think be construed with reasonable strictness." *Chapin* v. *Persse & Brooks Paper Works*, 30 Conn., 474. "But a mechanic's lien exists not by contract but by statute, and no understanding or agreement of the parties will be of any avail where the requirements of the statute have not been complied with, especially where third persons have acquired an interest, and the noncompliance is apparent on the public records as in the present case." *Larkins* v. *Blakeman*, 42 Conn., 294. See also *Hopkins* v. *Forrester*, 39 id., 351; *White* v. *Washington School Dist.*, 42 id., 545; *Cole* v. *Uhl*, 46 id., 296; *Shattuck* v. *Beardsley*, id., 386; *Mead's Appeal from Probate*, id., 433; *Westland* v. *Goodman*, 47 id., 83; *Nichols* v. *Culver*, 51 id., 177; *Kiel* v. *Carll*, id., 440; *Hill* v. *Matthewson*, 56 id., 323. The same rule of construction obtains in many other states. *Wagar* v. *Briscoe*, 38 Mich., 587, 593; *Farmers' Bank* v. *Winslow*, 3 Minn., 86, 93; *McCarthy* v. *Neu*, 93 Ill., 455, 457; *Capelle* v. *Baker*, 3 Houst., 344; Phillips on Mech. Liens, § 20. The plaintiff seeks to avoid the effect of these decisions by claiming that they apply the rule of strict construction only to those provisions of the statute which relate to the manner in which the lien shall be evidenced, and not to the extent of the lien itself; but no such distinction

has been recognized by this court in its construction of the statute, as will more clearly appear hereafter in discussing the main question in the case.

3. The main and controlling question in the case is this:— Was the plaintiff's inchoate lien continued and preserved by the certificate ? The trial court, after a full and extended hearing, and a most thorough inspection of the premises, ascertained and determined the extent of the inchoate lien to be as follows :—" There is necessary to the reasonable use of the cow stable for the purpose of stabling cows therein, so much land surrounding it as would be included within straight lines drawn, and produced to meet each other, ninety feet from and parallel with the outside lines of said building. The land thus included is necessary for cow yards, manure yards and approaches to the building. The Gunnings intended to fence in such cow yards and manure yards. There is necessary to the reasonable use of the silo and silo barn for storage purposes, and for the purposes of preparing and mixing fodder, one half acre of land surrounding the buildings, including that upon which they stand. There is necessary to the reasonable and convenient use of the creamery one half acre of land surrounding it, including the land upon which it stands. There is also necessary to the use of such buildings a right of way to each over said pentway and said driveways built by the Gunnings as aforesaid. For operating said buildings in connection with each other for the purposes aforesaid, the lands surrounding them as above, together with said right of way and the intervening land, making a tract of about eight acres, is necessary and reasonably convenient. This tract has at present no defining marks or physical boundaries." This was a question of fact, which this court will not review. *Bank of Charleston* v. *Curtiss,* 18 Conn., 342 ; *Keppel* v. *Jackson,* 3 Watts & Serg., 320 ; 2 Jones on Liens, §§ 1368, 1372. It must be conceded that this certificate does not describe the premises which were subject to the lien, or convey any definite information as to their location or limits ; that it does not show that there was any attempt to give an accurate and true description of such

premises; and that, as a matter of record, it has not the first element of certainty. In view of these facts, the trial court could not do otherwise than rule that the description in the certificate of the premises subject to the lien was grossly and fatally inaccurate, and that the certificate was therefore void. The decisions of this court fully warrant that ruling. *Rose* v. *Persse & Brooks Paper Works*, 29 Conn., 256; *Chapin* v. *Persse & Brooks Paper Works*, 30 id., 461; *Flint* v. *Raymond*, 41 id., 510; *Middletown Sav. Bank* v. *Fellowes*, 42 id., 36; *Shattuck* v. *Beardsley*, 46 id., 386; 2 Jones on Liens, §§ 1421–1423.

4. The plaintiff contends that the trial court erred in its interpretation of the meaning of the rule of law which permits a lien to cover not only the land under the buildings, but also such land as is used with them, and is necessary or reasonably convenient for their use. His claims in this regard, as applied to this case, may be resolved into these:— (1,) that the lien covers all the contiguous land of the owners of the buildings; or (2,) that it covers enough of the contiguous land to satisfy with the buildings the amount due; or (3,) that it covers all the land which was intended to be tributary to the buildings in carrying out the purposes for which they were built, and therefore covers the three hundred and fifty acres. This would seem to be an attempt to convert a question of fact, which has been conclusively determined by the trial court, into one of law. However, if the question be still an open one, there can be no difficulty in showing that the construction of the statute in question here, and the interpretation of the rule of law referred to, made by the court below, were in direct conformity with the decisions of this court, and that these claims of the plaintiff are utterly at variance with the principles of such decisions, and the theory of our lien law as therein stated. The statute is as follows:—" Every building in the construction or repairs of which, or of any of its appurtenances, any person shall have a claim for materials furnished or services rendered, * * * shall, with the land on which the same may stand, be subject to the payment of

such claim; and said claim shall be a lien on such land, building and appurtenances, and shall take precedence of any other incumbrance originating after the commencement of such services or the furnishing of any such materials." Gen. Statutes, § 3018. The language, "with the land on which the same may stand," has been a part of the statute since its first passage in 1836. In 1847 it was interpreted by this court in *Bank of Charleston* v. *Curtiss*, 18 Conn., 347, as follows:—" We think that the doctrine recognized by this court in *Frink* v. *Branch*, 16 Conn., 261, is properly applicable to the construction of this statute, and that not only the buildings and land on which they stand are covered by this lien, but also the building lot or land about the buildings, used with them, and necessary and reasonably convenient for their use." In *Chapin* v. *Persse & Brooks Paper Works*, 30 Conn., 461, this court says, (p. 472): " The theory of the lien is that the party furnishing materials for the erection or repair of buildings on credit retains his claim to them after they have gone into the building, and to enable him to enforce it his lien is spread over all the property with which the materials have become inseparably connected. Hence he is given a lien upon the whole building and the land on which it stands." See also Kneeland on Mech. Liens, § 98. While it may be true that in some other states, where the statute permitting liens is unlike ours, or the theory of the law or the practice is different from our own, the claim of the plaintiff may find some support, still it seems certain, in view of the authorities just cited, that they cannot be countenanced here. To give this statute the construction for which the plaintiff contends would be either to render these liens so burdensome and oppressive as to work great injustice to the owners, or to make them so fluctuating and uncertain in extent as to defeat the objects of the statute.

*J. S. Seymour*, for the defendants Alfred E. Austin and Christine L. Gunning.

With regard to the defendant Austin. Mortgagees and others acquiring interests in property against which a me-

chanic's lien is sought to be enforced, have a right to call
for strict proof of all that is essential to the creation of the
lien. *Davis* v. *Alvord*, 94 U. S. R., 545. The defendant
Austin's mortgage was taken August 22d, 1888. The plaint-
iff's contract was signed July 16th, 1888. His work began
the next day and was finished December 10th. Austin
was chargeable with notice of the plaintiff's lien. His mort-
gage must be read as though the statute describing the scope
of the plaintiff's lien were incorporated *verbatim* in it. As
between these parties Mr. Austin's deed must be construed
to be a first mortgage on the whole farm, except the new
buildings and " the land on which the same may stand,"
and a second mortgage on such buildings and land. The
most critical reading of the statutes and law reports of this
state would not suggest to him that the bulk of the farm
was not free. He would be led to the conclusion that all
lands capable of a separate use would not be subject to a
lien for the erection of the buildings. The equities of
builders are not overlooked. In this case those of the
plaintiff are not of the first order. He contracted to erect
buildings which did not add materially to the value of the
premises, and therefore cannot urge that third persons whose
rights have supervened can derive a benefit from his work.
When contracting to erect unusual buildings of great ex-
pense he should have also contracted for a mortgage of the
farm, if he purposed to claim the whole. Had he done so,
Mr. Austin would not have become a mortgagee or would
not have been misled. Such original equities as he might
have had have not been strengthened by fairly meeting the
obligation to do equity. He has unlawfully claimed the
whole. He has deliberately thrown away his certain lien
on the buildings and the eight acres, for the sake of grasping
at the whole, on the chance that this action might not be
defended. He is now putting forth a claim for this eight
acres, without relinquishing the remainder. While the pro-
ceeds of Mr. Austin's mortgage probably, if not presuma-
bly, went to make up the $8,000 which the plaintiff has been
paid, the plaintiff is seeking to postpone that mortgage to

his lien not only on the improvement itself but on the remainder, with which in no sense has his work been inseparably connected.

[The points made with regard to the defence of Mrs. Dunning, being the same as those of the preceding argument of Mr. Tweedy, are omitted.]

*J. B. Hurlbutt*, for the defendant William Lawler.

*D. Davenport*, for the Chemical National Bank.

CARPENTER, J. This is a suit to foreclose a mechanics' lien. The buildings, in respect to which the lien is claimed, are a creamery, a silo, a silo barn, and a cow stable. The land claimed to be subject to the lien is a tract containing three hundred and fifty acres. No question arises in respect to the notices. The certificate includes all the contiguous land owned by the proprietors. The Superior Court held that the lien could not include all the land, and further held that the certificate was void, inasmuch as it did not contain an accurate description of the land which was or which might have been subject to the lien; and dismissed the complaint. The plaintiff appealed to this court.

The question as to the quantity of land which may be subject to a lien is not always an easy one. In ordinary cases of city and town lots on which buildings are erected there is no difficulty. In respect to buildings used for mechanical and manufacturing purposes, especially if business is conducted on a large scale, there is more room for question. Not infrequently large tracts of land on which to erect mills, stores, warehouses, dwelling houses, and to be used even for farming purposes, are regarded as convenient, if not essential. Whether a lien attaches to all the land for the construction of a mill or other building used or reasonably convenient for carrying on the business, is perhaps a debatable question.

The question as to the extent of a lien for the construction of buildings used for farming purposes is now for the

first time before us. We apprehend that the question is the same in principle, whether it relates to a farm of a few acres or to an unusually large one. In either case the buildings are adapted to the needs of the farm. The farm is a unit; its component parts are land and buildings. In common language we say that the buildings are on the farm; that is, that they stand on the land. It is not a strained or unnatural use of language to say that the farm is the land on which the buildings stand. Thus the whole farm may be literally within the terms of the statute, which provides that "every building * * * shall, with the land on which the same may stand, be subject to the payment of such claim; and said claim shall be a lien on such land, building, and appurtenances." Gen. Statutes, § 3018.

Given a well defined farm, with boundaries easily recognized or ascertained, what portion of the land is covered by a mechanics' lien under our statute? For instance, a barn, suitable to house the stock which the farm will support, and to store the hay and grain which it will produce; will the lien cover all the farm, or only that portion of it immediately connected with the building? If the latter, then, in case of a sale or foreclosure, the barn is separated from the farm of which it was a part and the unity of plan, purpose and use is destroyed. The lienor or purchaser becomes the owner of a barn so situated that it will or may be of comparatively little use to him, while the owner is without a barn. Thus severing the barn from the land will in most cases operate to the disadvantage of both parties. It can hardly be supposed that the legislature intended, or that either party would desire, any such consequences. On the other hand there can be no particular hardship in subjecting all the land to the incumbrance. A lien is but a statutory mortgage. A sale or foreclosure is the same as if it were a mortgage. If the parties themselves were to create the incumbrance they would not limit it to a barn or other building; and we cannot presume that the legislature intended to subject the parties to an inconvenience that they would not have voluntarily assumed. In other juris-

dictions, where a sale instead of a strict foreclosure prevails, and where it is held that enough of the contiguous land may be sold to pay the demand, it is upon the principle that all the land is subject to the lien.

This view of the case is not really inconsistent with our former decisions under this statute. In the leading case of *The Bank of Charleston* v. *Curtiss*, 18 Conn., 342, the owners had erected a house and barn on a one-acre lot, including a garden fenced off by itself. The question was whether the lien covered all the land. The court held that it did, and said that "not only the buildings and land on which they stand are covered by this lien, but also the building lot or land about the buildings, used with them, and necessary or reasonably convenient for their use." This language cannot be said to have sole reference to the physical occupation of the buildings; for the fact is distinctly recognized that the garden may be used with them, and that it is "reasonably convenient for their use." A garden is no more necessary than a farm. This case certainly does not negate the proposition that farm buildings and the farm on which they stand may be so connected as to be inseparable in their relation to a builders' lien. On the contrary we think the proposition receives considerable support from it.

In *Rose* v. *Persse & Brooks Paper Works*, 29 Conn., 256, the real question was whether a lien on one mill would cover two other mills, not contiguous, but owned by the same proprietors. The court held that it would not. In *Chapin* v. *Persse & Brooks Paper Works*, 30 Conn., 461, the question was whether a lien for materials furnished for the same three mills, a separate account having been kept with each mill, covered all the mills jointly. The court held that it did not. Obviously these cases have little or no bearing upon the case before us; and none of the cases are directly in point; while some of them favor the views above expressed. *Fitch* v. *Baker*, 23 Conn., 563; *Brabazon* v. *Allen*, 41 Conn., 361; *Marston* v. *Kenyon*, 44 Conn., 349.

We come now to consider the precise question before us:— Did the plaintiff acquire and retain a valid lien on the

buildings and the three hundred and fifty acres of land? Was there such a lien against Gunning and his wife, the proprietors and contractors? That an inchoate lien on the buildings existed from the beginning is not disputed. That it continued in force until the certificate was filed with the town clerk is also conceded. Whether it continued in force after the time for filing such certificate expired, depends upon the extent of the lien on the land. If it covered all the land it is preserved. If the views above expressed with reference to farms generally are correct, it goes far towards a solution of the question.

At an early day this court refused to limit the operation of the lien to the land covered by the building. In *Bank of Charleston* v. *Curtiss*, *supra*, it said:—" To construe the statute thus literally and strictly would render the lien useless. There can be no value in a building to which there is no access, or which cannot be used conveniently." That the court meant by this language something more than a mere physical use or occupation of a building is apparent, for it was said with reference to a garden, which certainly is not essential to the actual occupancy of a dwelling house; but it is ordinarily used in connection with country and village dwellings; and so the court recognized it as so far a part of the homestead or dwelling as to be subject to the lien—a component part of the unit. It matters but little what the unit is, whether it is a city house with barely land enough for it to stand on; a country dwelling, including a garden, orchard, and the like; a farm with the usual farm buildings and a reasonable quantity of land; or a mechanical or manufacturing establishment, organized, used and regarded as one concern; in all such cases a broad and liberal policy would seem to dictate that in determining the extent of a lien regard should be had to the nature and ordinary use of the particular building or buildings under consideration. There seems to be no other suitable place for drawing the line. The step from the garden to the farm is but a short one at most, and upon principle there seems to be no room for a distinction, without destroying the unity

of design and use, by separating farm buildings from the land. If a lien is to exist at all in respect to such buildings and is not to be strictly limited to the land actually covered by them, there seems to be no other practicable rule than to regard all the contiguous land, however many lots there may be, as constituting, with the buildings, a unit, usually denominated the place or farm. As between the original parties no practical inconvenience can result from such a rule. There is less inconvenience and uncertainty in the application of such a rule than of a rule which arbitrarily carves out from a large tract of land a small portion around each building, with "no defining marks or physical boundaries."

There is some ambiguity in the phrase, "land about the buildings, used with them, and necessary or reasonably convenient for their use." Taken in one sense it means simply sufficient land to afford reasonable access to the buildings— an opportunity to occupy them. In another and broader sense it means a quantity of land suitable or proportioned to the buildings, having regard to the purposes for which such land and buildings are ordinarily used. The former, or restricted sense, is that contended for by the defense; the latter, or broader sense, is that contended for by the plaintiff. The court below seems to have used it in both senses; in determining the quantity of land convenient for the use of these buildings, in a limited sense; in considering the quantity of land suitable to be used in connection with these buildings, in the broader sense. This is apparent from the following quotation from the finding:—"Said buildings are each larger than is required for use in connection with the consolidated farm of three hundred and fifty acres. The three hundred and fifty acre tract is not capable of producing the amount of fodder which two hundred cows require, and which the silo and new barn are capable of storing. If adjacent lands sufficient to supply the deficiency were acquired as intended by the Gunnings, the old buildings removed and the whole used for the purposes and upon the scale designed by them, the new build-

ings would *be necessary and reasonably convenient for use in connection therewith, for the purposes for which they were intended."* We entertain no doubt that the court in *Bank of Charleston* v. *Curtiss* used that language in the broader sense, thereby meaning that there should be an adaptation of the land to the buildings and of the buildings to the land.

The plans and intentions of the Gunnings were known to the plaintiff. The finding on that point is as follows:— " Before entering into said contract with the Gunnings, the plaintiff went to Wilton and viewed the premises, and saw the intended location of the contemplated buildings. The boundaries of the farm were then pointed out to him by Mr. Gunning, and the intentions of the Gunnings with reference to the farm and the uses to which it was to be put, as above stated, and the intention to purchase additional adjacent lands heretofore mentioned, were then fully made known to him by Mr. Gunning."

The object of all this we know not; but if the plaintiff had desired to obtain this information with reference to a lien, we should expect him to do as he did. We can hardly conceive of any other purpose which he could have had in view. Under the circumstances it seems to us reasonably certain that the original parties contemplated, not only a lien, but that it should cover all the land. If that is so, the Gunnings cannot complain if the lien as to them is held good, and to the extent claimed.

Establish the lien as against the proprietors, and the objections to the plaintiff's case are practically disposed of. The object of a lien is security. If not good against creditors and subsequent incumbrancers, it is worthless. Any construction of the statute which makes it mean one thing as to the owner, and another thing as to creditors, is inadmissible.

In ascertaining whether a given case is within the statute, the statute will be construed with reasonable strictness. But when it has once been determined that the statute applies,

the effect and consequences must be the same as to all. Any other rule would be intolerable.

There is one expression in the opinion in *Chapin* v. *Persse & Brooks Paper Works*, *supra*, which apparently encourages the idea that the statute will be construed with greater strictness in favor of creditors. But obviously that was not intended, as will appear from the connection in which it is said. " But in the certificate the three mills are all included together, and a lien claimed on them all for the gross amount of the materials furnished for each and all of them together, thus attempting to make the whole three mills together liable for the materials furnished for each separately. We cannot think that this was intended to be allowed by the statute, which, as it gives peculiar privileges to certain creditors, contrary to the general policy of our law, which favors an equal distribution of the effects of insolvents, should, as we think, be construed with reasonable strictness."

What then does the statute mean when applied to farm buildings? That it intended to give a lien on such buildings there can be no question. That it intended to give a lien that would be of some value to the mechanic is equally clear. In many cases a lien that gives only a barn yard with access to the barn, would be of little value to the mechanic. A barn without a farm, and a farm without a barn, are incomplete. If one is widely separated from the other there is a practical inconvenience which may seriously impair its value. It is not probable that the legislature intended that.

Again; there is some difficulty in determining just how much land should go with a barn or other farm building in order to give it its full fair value. If it is to accomplish the object aimed at it must include something more than land enough to make it possible to use it. As a rule the farmers themselves are better qualified to determine how much it shall be than the courts are. Each one may be trusted to erect such buildings, and such only, as may be needed or useful; and whenever occasion requires, which will be but seldom, the courts will have no difficulty in ascertaining the

quantity of land, contiguous to the building, that it was intended should be used with the building.

We are aware that the rule here indicated will, at first sight, appear to be very liberal ; but it is believed that it will not be found to be an unreasonable one, and that it will occasion less inconvenience and hardship than any other that can be suggested. Indeed we are brought to this alternative :—either to construe the statute so as to give effect to the presumed intention of the parties, or to so construe it as to seriously impair the value of the lien. We think the former construction is to be preferred.

The case before us is an extreme one. It will rarely happen that buildings on so large a scale will be constructed. Whenever they are, it will be in connection with and to accommodate a large tract of land. In no other way can anything approximating to their full value be realized. If these buildings are to be limited to eight acres of land they are substantially worthless, and the lien which the legislature intended should benefit the mechanic, is a delusion and a snare.

We think the court erred in not granting the prayer of the complaint.

In this opinion the other judges concurred.