FILSTON FARM COMPANY OF BALTIMORE COUNTY ET AL. *vs.* HENDERSON & COMPANY.

*Building Contract—When Architect's Certificate a Condition Precedent of Owner's Liability for Price—Waiver of Production of Certificate —Failure of Architect to Supervise Construction—Amendment of Equity Pleading—Deduction from Contract Price of Building, When Contractor Fails to Complete in Time and Manner Stipulated —Interest—Mechanics' Liens—Designation of Boundaries—Quantity of Land Adapted for use of Agricultural School.*

When a contract for the erection of a building provides that monthly payments for the work done during the preceding month shall be made only upon certificates of the architect that the work has been done in conformity with the specifications, the general rule is that the production of the certificate of the architect is a condition precedent to the liability of the owner to pay, unless the refusal of the architect to give the certificate was due to fraud or bad faith.

But under some circumstances, the conduct of the owner or of his architect may amount to a waiver of the production of the certificate, or the owner may be estopped to rely upon its non-production as a defense to an action on the contract.

A contract for the erection of large buildings, within a short time, subject to the supervision of the architect, made his certificate a condition of the liability of the owner to pay the contract price.   The architect refused to give this certificate because the mortar used in the construction of the walls and piers, and also the interior plastering and parts of the wood-work were defective.   He did not object to the inferior work and material until after a certificate was called for, and during the progress of the work he agreed that a different kind of mortar should be used than that specified in the contract; and he should have condemned the plastering at the time it was applied.   The evidence showed that the

builder endeavored in good faith to comply with the contract. *Held*, that, under these circumstances, the production of the architect's certificate as a condition of the owner's liability was waived, and that the owner is liable for the contract price less such sum as is necessary to make the building correspond with the specifications.

After much testimony was taken under a bill to enforce a mechanic's lien for the erection of a building, which was inadmissible under the pleadings, the trial Court allowed the bill to be amended so as to charge that the defendant's architect wrongfully refused to make an estimate of the work and give the complainant a certificate therefor as required by the contract. *Held*, that the Court had the power to authorize this amendment to be made.

When an architect declares that he would not, on account of another controversy, give to the builder a certificate for certain extra work, which had been ordered in conformity with the terms of the contract, the builder may recover therefor without a certificate.

The contract for the erection of a building provided that it should be completed on September 1st, and that the contractor should pay the owner one hundred dollars for each day that the work should remain unfinished after that date. The building was not then finished, and the contractor soon afterwards ceased work on account of the refusal of the architect to give him a certificate for the work done in August, and brought suit. The evidence showed that the defects could be corrected, and the building made to conform to the specifications for a certain sum, and within about forty-five days. *Held*, that the owner should be allowed two weeks in which to obtain a new contractor, as well as the forty-five days for the completion of the work, and is therefore entitled to an allowance of one hundred dollars a day for sixty days, under the time clause of the contract, and this sum, as well as the amount required to correct the defects in the building and complete it, should be deducted from the contract price.

*Held*, further, that the owner should not be required to pay into Court the sum found to be necessary to correct the defect in the building and complete it, to be paid to the contractor when he shall have made such correction and completion, but that sum should be allowed to the owner as a credit on the contract price.

When a contractor fails to remedy the defects in a building erected by him, but brings a suit in which it is adjudged that he is entitled to a certain sum less the amount required to make the building conform to the specifications, the contractor is not entitled to interest on the sum adjudged to be due him from the time it was payable under the contract, but only from the date of the decree.

The owner of a tract of land containing about seventeen hundred acres, which embraced three distinct farms with their respective buildings, and other land, made an agreement for the erection of buildings on one

of the existing and distinct farm tracts, containing about two hundred acres. These buildings were to be used as a school for instruction in agricultural and domestic science. Code, Art. 63, sec. 4, provides that a mechanics' lien shall extend to a ground covered by a building and so much other ground immediately adjacent thereto, as may be necessary for the ordinary and useful purposes of the building. *Held*, that the lien should be restricted to the said farm tract of two hundred acres, and does not embrace the adjoining land owned by the defendant.

Code, Art. 63, secs. 6 and 7, relating to mechanics' liens, provides that if the designation of the boundaries of the land be not made before the commencement of the building, then it shall be lawful for the owner of the land or the lien claimant to petition the Court to designate the boundaries, and that the Court shall direct a surveyor to make a report, designating the extent of ground necessary for the convenient use of such building for the purpose for which it was designed, and that the report, if approved by the Court, shall be conclusive upon all persons concerned. After the filing of a bill to enforce a mechanics' lien, a petition for the designation of the boundaries of the land appurtenant to the building was filed in the case, and a report of the surveyor was made upon which no action was taken until the final decree. *Held*, that, under these circumstances, the designation of the boundaries made by the surveyor is not conclusive, but is open to review on appeal.

*Decided June 26th, 1907.*

Appeal from the Circuit Court for Baltimore County (Van-Bibber, J.)

The case was argued before Briscoe, Boyd, Pearce, Schmucker, Burke and Rogers, JJ.

*Edgar H. Gans, Leon E. Greenbaum* and *W. Calvin Chesnut* (with whom was *Geo. R. Gaither* on the brief), for the appellant.

An analysis of the testimony will show that the architect not only acted honestly and in perfect good faith in withholding the certificate asked for in September, but further than that, it appears that he was right and justified in so doing. Indeed, although the opinion of the lower Court stated that the architects were *without justification* in withholding the certificate, we think it clearly appears from the opinion and the decree that they were amply justified in withholding it.

At the time when they were requested to give the certifi-
cate, the building, according to the testimony of the plaintiff's
witnesses, was very nearly completed, and only about a thou-
sand dollars' worth of additional work was done between that
and October 22nd, when the building was closed up by the
plaintiff's workmen, and attempted to be delivered to Mr. Perky.
Nothing further has been done to the building by the builders,
and no change has been made in it.    It has not been accepted
or put to any use by the owner, nor has it ever been occupied.
It has, however, been inspected from time to time by various
builders, architects, masons, etc., who have testified in the
case.    The building, therefore, was in pretty much the same
condition in the middle of September, when Mr. Esenwein
condemned a large part of the work, that it was in at the time
of the rendition of the opinion and the decree of the lower
Court.

By this decree the Court requires the sum of $15,000 to be
paid into Court, to be applied to the correction of eight classes
of enumerated defects, towit: those in the stone walls; the sup-
ply of omitted iron anchors; the replastering of the building;
the resetting of the fire-places; the fitting of fillets of wood to
the foot rafters, to close out daylight; the rebuilding of defective
piers under the auditorium floor; the relaying of flooring in base-
ment, and the reframing, resetting and refinishing all mill-work
injured in making the above repairs.

The Court, therefore, found that it might require as much
as $15,000 to remedy these numerous and substantial and per-
vasive defects.    What would be thought of an architect of
the reputation and great experience of Mr. Esenwein who
would accept a building in the condition in which the Court
evidently found this building to be?

When the architects, under date of September 20th, 1904,
determined that the character of the defects was so serious·
and so pervasive that, in their judgment, they could not ac-
cept the building in that condition, it was much more favorable
to the builders to be told so *immediately*, and not allowed
by the architects to proceed for another month or more of
work, and then meet with a final condemnation.

No case could possibly emphasize the importance of the custom of providing for the decision of controversies by an architect better than the present case.   No Court and no lawyer, and, indeed, no one other than a skilled architect or builder is competent to pass upon the numerous complicated details and controversies which can grow out of the ordinary building contract and which have grown out of this particular contract.   The Courts have, therefore, with great unanimity recognized the necessity and desirability of such a contract, have held it to be valid, and have refused to review the decision of the umpire chosen by the parties, except where he is shown to have acted fraudulently and dishonestly.   *Barlow* v. *U. S.*, 35 Ct. Cl. 514.

The testimony in the case shows quite clearly that the omissions and defaults of the contractors with regard to this work were not slight, inadvertent and unintentional, but, on the contrary, were willful and intentional.   To summarize on this point, these derelictions were certainly willful in the following particulars:

1. Omitting the anchors from the auditorium floor, and falsely representing that they were in place in number as specified.

2. Concealing bad mortar in the interior of the columns under the auditorium, and in the masonry generally, by putting inferior mortar on the inside and then pointing up with mortar of good quality.

3. In the failure of the stone mason to point up the exterior walls as directed by Mr. Thompson.

4. Using rejected flooring in the absence of Mr. Thompson.

5. Ignoring the architects' representative, Mr. Thompson, and practically driving him away from the work.   This was the conduct of McQuade.

6. The willfulness of the contractors is also shown in their absolutely ignoring the letters of August 18th and 19th, and September 20th, written to their Philadelphia office by the architects, and their refusal to remove materials condemned by the architects when the contract expressly provided that they must do so.

7. A default which also could not have been merely inadvertent, but must have been intentional, was the departure from the specifications with regard to the putting on of the roof boarding closer than an inch, when the specifications required them to be laid with one inch spaces between boards for all shingle roofs. The object of this was for ventilation.

8. The failure to correct the defects in the auditorium posts, which were called to the attention of the contractors both verbally and in writing, was certainly most willful on their part; and their conduct has been described by Mr. Dempwolf as damnable.

9. The character of the plastering, which was admitted all around to be very bad indeed, and was so bad as to be called beastly by Mr. Dempwolf, is such that its departure from the specifications cannot be regarded as either slight, inadvertent or unintentional.

The cost of remedying the defects in the building, so far as they can be remedied, is difficult of ascertainment. Where witnesses have undertaken to give any estimates, the estimates vary from $2,500 to $20,000.

The opinion of the Court below amounts to an express finding that at the time the contractors abandoned work on the building *they had not substantially complied with the specifications*, and in recognition of this the Court in its decree reserves the sum of $15,000, approximately twenty per cent. of the cost of the building, to be applied towards putting the building in a condition where it will, at some time hereafter, substantially come up to the specifications. And it is to be noticed in passing that the final determination of the question of whether the building does, when patched up and altered, substantially come up to the specifications, is to be reached by the Circuit Court for Baltimore County, and not by Messrs. Esenwein & Johnson, designated for that purpose in the contract between the parties. This, then, is the case of making a new contract, which the parties never agreed to and which it is entirely evident they would never have made.

There are two conclusive reasons which prevent any recovery by the plaintiff in this case.

1. The first is that payments were to be made by Mr. Perky and the Filston Farm, only on the condition precedent of the production of architect's certificates. These were admittedly not produced, and, under the Maryland decisions, the only legitimate excuse for a failure to produce them is a showing of fraud or bad faith on the part of the architect. There is no such evidence in this case. *Gill* v. *Vogeler*, 52 Md. 663; *Lynn* v. *B. & O. R. Co.*, 60 Md. 404; *B. & O. R. Co.* v. *Brydon*, 65 Md. 198; *Annapolis, etc., R. Co.* v. *Ross*, 68 Md. 310; *Geiger* v. *Western Md. R. Co.*, 41 Md. 4; *B. & O. R. Co.* v. *Canton Co.*, 70 Md. 405. See also *U. S.* v. *Gleason*, 175 U. S. 588; *Kihlberg* v. *U. S.*, 97 U. S. 398; *Sweeney* v. *U. S.*, 109 U. S. 618; *Railroad Co.* v. *Marsh*, 114 U. S. 549; *Chicago, etc., R. Co.* v. *Price*, 138 U. S. 185.

Even if the architect was not justified in withholding the certificate on September 10th, 1904, this did not create any breach of the contract by the defendants and did not excuse the plaintiffs from endeavoring to procure the final certificate. By the terms of the contract the final payment was not to be made until sixty days after the completion of the building, and it was further provided that partial payments should not be held as conclusive evidence of the acceptance of the building. It was, therefore, entirely open to the architect to either accept or reject the building when the final certificate became due. The plaintiffs made no effort whatever to obtain this certificate. They never requested the architect for it. They presumably thought that as he had condemned a large portion of the work in September, he would not give a final certificate. This, however, constituted no excuse for their failure to comply with the contract in asking for it. If their position is right, then the architect ought to have given the final certificate. If the architect was right, then he was justified in refusing it; but in either event the contract expressly imposes the obligation upon the plaintiffs to obtain this certificate, and they certainly cannot recover under the contract when they have made no effort whatever to obtain the certificate and have not asked for it. It was no part of the duty of the defendants to obtain

the certificate; but this was an obligation resting upon the plaintiffs to be complied with before they obtained payment.

In *Gilmore* v. *Courtney*, 158 Ill. 432, it was held that fear on the part of the builder that an architect would not give a certificate was no excuse for the builder's failure to request the certificate.

2. Even if there had been no provision in the contract requiring the production of architect's certificate as a condition precedent to payments by the owners, nevertheless the plaintiffs would not be entitled to enforce their alleged lien claim because there has been no substantial performance of the contract. 6 *Cyc.*, 54 to 59; 30 *A. & E. Ency.*, 1224. 1226; *Presbyterian Church* v. *Hoopes Co.*, 66 Md. 59; *Coates* v. *Sangston*, 5 Md. 133; *Denmead* v. *Coburn*, 15 Md. 44; *North Bros.* v. *Mallory*, 94 Md. 317; *Ingle* v. *Jones*, 2 Wall. 1; *Hanley* v. *Walker*, 8 L. R. A. 207; *Elliott* v. *Caldwell*, 9 L. R. A. 52; *Sheffield Co.* v. *Gordon*, 151 U. S. 285; *Mitchell* v. *Williams*, 80 N. Y. App. Div. 527.

3. The plaintiffs are not entitled to recover for the additional work because they never submitted any bills therefor to the architects or defendants, and never obtained any approval thereof.

The compensation to the builders for this additional work was to be the cost of the work to them, with a ten per cent charge added, and to be their only compensation for doing this additional work. The object of requiring bills to be submitted to the architects for approval was to constitute a check on inflated charges for additional work; and it was contemplated that these bills should be submitted at a time when these facts were all fresh in the recollection of the parties, and when they could be fairly and accurately passed upon by the architects. This approval by the architects of the bills for the additional work was to be just as much a condition precedent to the payment therefor as the estimates of the architects were to be a condition precedent to payments under the main contract.

It is admitted by the plaintiff's witnesses that they were *unable to produce bills* for any but a very few of the items in

the claim, and it was further admitted that most of the items were only *estimated.* The testimony on those items which they did undertake to prove specifically was made up largely of *inference, conjecture and hearsay.* We submit that it is impossible for the Court to read the testimony in regard to this bill of extras, and come to any fair conclusion that the claims are satisfactorily proved.

In *Baltimore Cemetery Co.* v. *Coburn,* 7 Md. 202, it was said by the Court: "Owners are very much in the power of builders and architects. Changes, apparently unimportant, are often made, the first knowledge of which comes to the owner in the shape of an additional charge for extra work."

In order to obviate this it is very generally now provided in building contracts that no extra work shall be allowed for unless there is given a written order for the same, or it is sometimes provided that the amount of extra work done shall be estimated and determined by the architect or engineer in charge of the work, or, as in this case, the bills for extra work must be presented to and approved by the architect or engineer. All of these different provisions are customary and are substantially of the same effect. The condition must be complied with before any liability on the part of the owner arises to pay for the extra work. See also *O'Brien* v. *Fowler,* 67 Md. 561; *Merritt* v. *Penin. Con. Co.,* 91 Md. 453; 30 *A. & E. Ency.,* 1287; 6 *Cyc.,* 77.

The excuse of McQuade for not presenting the bills to the architects for approval, that he was busy getting up the data for the suit is, of course, an explanation, but no justification for the failure of the plaintiff to comply with the condition precedent. Likewise the explanation of Swindells above referred to, that the bills for the additional work were not submitted either to the architects or to the defendant because the architects had refused a certificate is not a satisfactory excuse for a failure to comply with the condition required by the contract. The theory of the plaintiff in regard to this, as we understand it, is that the refusal of the architects to make an estimate was a breach on the part of the defendants of their

duty under the contract, which justified the plaintiff in refusing to perform those terms of the contract binding upon him.

The bill should be dismissed because the damages for delay exceed the amount of the plaintiff's claim for work.

By the terms of the contract, it was provided that the building should be completed ready for occupancy on September 1st.    Henderson & Co. ceased work on the building on October 22nd, and then attempted to make a delivery thereof to Mr. Perky.    He refused to accept it.    Henderson & Co. shortly thereafter brought this suit.    The defendants have never accepted the building, nor occupied it, nor made any use of it whatever.

There can be no doubt that the contract specifically provided, in the most emphatic terms, that the time of completion of this building was to be of the essence of the contract; and it is equally clear that Henderson & Co., in addition thereto, were advised and frequently reminded of the necessity and importance to Mr. Perkey of having the building completed on time.    They did not complete it on time; they did not even attempt to make a delivery until fifty-two days after the work should, by the terms of the contract, have been finally completed, and they have not yet completed the building.

The demurrage claim is now, of course, in excess of the amount claimed by Henderson & Co.    Why should this demurrage not be enforced against them?    The defendants are in no wise responsible for the delay; they have not at all occasioned it; they have not put obstructions in the way of the builders, but, on the contrary, the builders' own course is directly responsible for this enormous delay?

The decree is also erroneous because it subjects to the lien an excessive amount of land.

The lien claim was originally filed to cover about seventeen hundred acres.    The defendants applied by petition to the Circuit Court for Baltimore County to describe the boundaries of the lien claim.    This was in accordance with section 6 of Article 63 of the Code.    The Court referred the matter to the surveyor, in accordance with section 7 of the same Article.

The surveyor, in pursuance of a further order of Court, took testimony and filed his report. In this report he designates the boundaries containing twelve hundred and ninety-three acres of land.

Under section 7 the amount of land subject to any mechanic's lien for the erection of a building is absolutely limited to such amount of land as *is necessary for the ordinary and useful purposes of such buildings*, or, "necessary for the *convenient use* of such building for the purpose for which it was designed." These two expressions are, in substance and effect, the same.

We maintain that the testimony in this case does not show that twelve hundred and ninety-three acres of land, consisting of five separate farms, can possibly be construed to be necessary for the *ordinary, useful* or *convenient* purpose of a *school building;* and the construction sought by the plaintiffs to be placed upon the language of the statute as applied to the facts of this case is a strained and unnatural one. The theory of the plaintiffs, which seems to run through their testimony taken before the surveyor, is that this vast extent of land is necessary for the *financial support* of this building, or, as is more probably their real idea, that this amount of land is necessarily to be subjected to the lien claim in order to realize upon a sale a sufficient amount to pay their claim, if established. They have submitted testimony to the effect that the building of itself is of no value apart from the land. This view of the matter seems to have been in a large measure adopted by the surveyor and by the Court. We think it is an entirely mistaken view of the meaning of the statute. The amount of land given in connection with any building on which a mechanics' lien is established is only for so much land as may be necessary for the convenient uses of the building as such, not such amount of land as may be *necessary for the financial support of the building as such*. It may have been Mr. Perky's idea in purchasing the stock of the Filston Farm to use the whole farm as an *endowment fund* for the running of this school building. But that does not in any way justify

the extending of the mechanics' lien over the whole farm building on the theory that the farm of eleven or twelve hundred acres is necessary for the convenient use of the school building.

If a philanthropist owns fifty acres of land in the heart of a city and deeds it to a corporation for the construction and maintenance of a hospital, which occupies perhaps five acres of land, and the directors of the hospital corporation lease out the rest of the land for the purposes of producing revenue to run the hospital. a mechanics' lien for the construction of the hospital building could not properly be extended, under our statute, to the whole of the fifty acres.

In a number of cases mechanics' liens were extended over a large area of ground; in one case covering 22,000 acres, in the State of New Mexico, in connection with irrigation ditches which had been constructed for the benefit of that amount of land. The surveyor, and very possibly the Court below, were influenced by these cases; but an examination of them shows that they are in no way authorities in the case at bar, either on account of their different facts or by reasons of the different wording of the statutes under which they were decided. On the contrary, if the consideration of cases is limited to those arising under statutes substantially similar to the Maryland statute, it will be found that the authorities do not warrant the conclusion of the surveyor and the Court below as to the extent of this lien claim. *Springer Land Association* v. *Ford*, 168 U. S. 153; *Tunis* v. *Lakeport Assn.*, 98 Cal. 286; *Iron Works* v. *Taylor*, 12 Colo. App. 459; *Girard Co.* v. *Southwark Co.*, 105 Pa. 248; *Sicardi* v. *Keystone Oil Co.*, 149 Pa, 139; *Beehler* v. *Ijams*, 72 Md. 193; 20 *A. & E. Ency.*, 281; *Phillips on Mechanics' Liens*, 350.

*Frank Gosnell* and *Osborne I. Yellott* (with whom was *Carroll T. Bond* on the brief), for the appellee.

The boundaries of land subject to the lien claim of the appellee were properly demarked by the surveyor. *Broughill* v *Gaither*, 119 N. C. 443; *Chotean* v. *Thompson*, 2 Ohio St. 114;

*Holland* v. *McCarty*, 24 Mo. 82; *Edward* v. *Derrickson*, 28 N. J. L. 469; *Ford* v. *Springer Land Assn.*, 8 N. Mex. 37, 168 U. S. 513; *Lindsay* v. *Gunning*, 59 Conn. 296, 11 L. R. A. 553; *Sicardi* v. *Keystone Oil Co.*, 149 Pa. 139.

The appellee contends that it entered into a contract with Henry D. Perky and the Filston Farm Company for the erection of the building; that it began work and had nearly completed the building, but that before it had been fully completed, and while the appellee still had time under the terms of the contract to correct defects and imperfections in the work, the Architect Esenwein arbitrarily, unjustly and in bad faith condemned virtually the whole of the work that had been done, demanded that the same be taken down and rebuilt, and refused absolutely to give the required certificate for the payment of amounts then admittedly due; that the owners knowing such conduct of the architect to have been wrongful and unjust, adopted such action of the architect as their own and refused payment of the sums then admittedly due, thereby breaking the contract and virtually rescinding the same as far as they had the power so to do; and that the appellee thereupon completed the building.

Under these circumstances we contend that the owners, having broken and rescinded the contract during the course of performance, the appellee is entitled to the fair value of the work and materials furnished under the same, towit: the contract price agreed upon, less such amount as may be properly deducted on account of imperfections in the work and deviations from the plans and specifications. *McGrath* v. *Gegner*, 77 Md. 331.

The doctrine of substantial performance is found to have peculiar application to building contracts, where a builder having placed upon another's property a valuable improvement which varies in some particulars from some of the requirements of the contract, would be without remedy if held to a literal interpretation and enforcement of his contract. In such cases the law very justly says that a benefit having been conferred upon the owner, though not literally what he contracted for,

the owner must pay what the benefit is fairly worth to him. If the variations are so material as to defeat the purposes for which the building was designed then obviously there could be no benefit and it would be unjust to make the owner pay for it.    But if by a reasonable expenditure of money, to be deducted from the contract price, the building could be made substantially what had been contracted for, then the owner should properly be made to pay its reasonable value as so ascertained.

The doctrine is never invoked as a reward to a contractor who has done his best, nor is its application ever withheld as a punishment to a contractor who has failed to do his best.   It is both invoked and applied. as a rule, upon common sense and equitable principles, under the facts of the particular case, in hand, and in those jurisdictions where the courts have attempted to limit its application by fixed rules, much hardship has frequently been found to result.

In the case of *Presbyterian Church* v. *Hoopes Co.*, 66 Md. 598, the doctrine of substantial performance is, in our opinion fully recognized in its true spirit, a spirit much more equitable than that characterizing the New York decisions.   It was never contemplated by the parties that the contractor should put, as it did, over ninety thousand dollars upon the property of the owners and be wholly refused payment in the end for the balance due on the ground that the building did not comply with the plans and specifications.

The owners expressly reserved full control over the performance of the contract.   If the work was unsatisfactory or materials unsound they had the absolute right, through their architect, who was always on the ground in the person of an assistant, to order it out, so long as he acted in good faith. And, finally, if the work did not progress satisfactorily the owner himself could take it over and complete it.   And it was expressly agreed that during the course of the work the contractor was to receive 80 per cent. of the fair value of the work and material in place, and that if the contractor even abandoned the work it was still to be paid the amount due upon

an adjustment of accounts.   In *Hayward* v. *Leonard,* 7 Pick. (Mass.) 181, "The plaintiff contracted in writing to build a house for the defendant at a certain time and in a certain manner on the defendant's land, and afterwards built the house within the time and of the dimensions agreed on, but in workmanship and materials varying from the contract.   The defendant was present almost every day during the building, and had an opportunity of seeing all the materials and labor, and objected at times to parts of the materials and work, but continued to give directions about the house, and ordered some variations from the contract.   He expressed himself satisfied with a part of the work from time to time, though professing to be no judge of it.   Soon after the house was done he refused to accept it, but the plaintiff had no knowledge that he intended to refuse it till after it was finished.   *Held*, that the plaintiff might maintain an action against the defendant on a *quantum meruit* for his labors, and on a *quantum valebat* for the materials."

This case has been cited with approval or followed in the following, among other cases: *Smith* v. *Lowell,* 8 Pick. (Mass.) 178; *Taft* v. *Montague,* 14 Mass. 282; *Olmstead* v. *Beale,* 19 Pick. (Mass.) 528; *Snow* v. *Ware,* 13 Metc. (Mass.) 42; *Lord* v. *Wheeler,* 1 Gray (Mass.) 282; *Hayden* v. *Madison,* 7 Greene (Me.) 76; *Jennings* v. *Camp,* 13 Johns (N. Y.) 94; *Kettle* v. *Harvey,* 21 Vt. 301; *Burns* v. *Miller,* 4 Taunt. 745; *Chapel* v. *Hickes,* 2 C. & U. 214; *Thornton* v. *Place,* 1 U. & R. 218.

And as bearing upon the other point, that the rights of the parties are to be governed by the contract between them, and not by technical rules adopted in the case of other and different contracts, we would refer to *Watchman* v. *Crook,* 5 G. & J. 240; *Milske* v. *Steiner Mantel Co.,* 103 Md. 249.

Our contention, in brief, upon this branch of the discussion, is that the appellee is clearly entitled to be compensated for the fair value of the labor and material which entered into the building in question, whether such fair value is to be determined by an estimate of the actual value of material and labor which entered into the structure or by the contract price, less

a fair allowance for imperfections, the latter having been the method adopted by the learned Judge below as the one best calculated to subserve the ends of justice.

As to the bad faith of the architect. It was never the understanding or intention of the parties in making the contract that the architect should refuse to give a certificate when a large amount of work was actually in place, and thereby virtually determine that there was nothing in place, or to enable the owner to escape liability for a valid bill for extra work and material for the sole reason that the architects might, out of mere caprice, refuse their approval of such bills.

The owner never contemplates, in making such a contract, that the powers of discretion vested in the architect are to be exercised in such manner as to give him the benefit of the contractor's labor and material without cost, and the contractor certainly never contemplates that such shall be done. In brief, the whole contract is based on the assumption of both parties that the powers of discretion vested in the architect are to be fairly and honestly exercised. The moment that the architect fails to so exercise such powers of discretion the object of one or the other of the parties is defeated and there is substituted for the contract entered into a new undertaking on the part of such party that he will abide by the decision of such arbiter, no matter how unfair or dishonest it may be. The attempt to enforce an agreement such as this would be to enforce an agreement into which the parties had never entered. *B. & O. R. Co.* v. *Brydon*, 65 Md. 198.

In the case at bar it is a very simple matter to show to the satisfaction of any Court that the act of the architect in rejecting the whole of the work and condemning the entire building, also in refusing to approve any bills for additional or extra work in place, was not an exercise of good faith toward one of the parties to the contract, whereas, on the other hand, in view of the reasons, excuses and apologies given by the architect for such rejection and refusal, it might be of some little difficulty for the same Court to say that the architect had been guilty of a positive fraud toward the contractor, as the word "fraud" is ordinarily understood in law.

The unimportance of any attempted distinction between the failure to exercise good faith in matters of this character, and the commission of positive and deliberate fraud is clearly shown in the opinion of the Court. *Lynn* v. *B. & O. R. R.*, 60 Md. 404, at 417–18, where the Court holds that in such cases it is unnecessary to prove a design to injure, deceive or defraud one of the parties to the contract since, if in point of fact the judgment was dishonest and fraudulent, any inquiry into the design itself would be immaterial.

In many of the States unjustifiable and arbitrary refusal of the architect to give a certificate is held to be no bar to recovery. *Nichaelis* v. *Wolf*, 136 Ill. 68; *Frost* v. *Rand McNally Co.*, 51 Ill. App. 276; *Crawford* v. *Wolf*, 29 Iowa, 567; *Nolan* v. *Whitney*, 88 N. Y. 648; (Slight defects, refusal unreasonable); *Van Kenren* v. *Miller*, 71 Hun. 68; *Sullivan* v. *Byrne*, 10 S. C. 122; *Bentley* v. *Davidson*, 74 Wis. 420; (Arbitrarily withheld); *Fowler* v. *Deakman*, 84 Ill. 130; (same); *Moran* v. *Schmidt*, 109 Mich. 282, (Neglect of inspector).

The arbitrary refusal of an architect to accept performance where work has been in good faith performed, constitutes a *fraud in law*, availing to dispense with the necessity for his judgment as a condition precedent to recovery by the contractor. *Crane Elevator Co.* v. *Clark*, 80 Fed. 705.

It is competent for the parties to a contract of the nature of the present one, to make it a term of the contract that the decision of an engineer or other officer, of all or specified matters of dispute that may arise during the execution of the work shall be final and conclusive, and that in the absence of fraud or mistake so gross as to necessarily imply bad faith, such decision will not be subject to the revisory power of the Courts. *U. S.* v. *Gleason*, 175 U. S. 588, 602.

The owner must bear the burden of the engineer's lack of ability or honesty, as the obligation is on him to furnish competent and honest engineers. *Price* v. *C. S. F. & C. Ry.*, 38 Fed. 304. They must follow the contract, and if estimates are based upon an erroneous view of it, they will not conclude the parties. *King Iron Bridge, etc.*, v. *St. Louis*, 43 Fed. 763;

*Lewis* v. *C. & C.*, 49 Fed. 708; *Galveston, etc.*, v. *Henry*, 65 Fed. 585; *M'burg* v. *March*, 114 U. S. 549; *Galveston, etc.*, v. *Johnson*, 74 Fed. 256. The contractor may prove value otherwise either in suit on contract or on *quantum meruit*, where the architect unreasonably and in bad faith refused a certificate. *Thomas* v. *Fleury*, 26 N. Y. 26. Failure to exercise an honest judgment is sufficient. *N. Amer. Ry. Const. Co.* v. *R. E. McMath & Co.*, 116 Fed. 169.

Certificate of the architect may be overcome by proof that such certificate is false, and the result of caprice or malice. *Eldridge* v. *Fuhr*, 59 Mo. App. 44.

Estimates are only *prima facie*. Courts are not to be ousted by agreement, so they are not strictly speaking "conclusive" notwithstanding stipulation to the contrary. May be attacked either for fraud or mistake. The burden is on the attacking party to prove by preponderance of evidence. *B. & C.* v. *Scholes*, 14 Mo. App. 524. See also *Supreme Council* v. *Fersinger*, 125 Ind. 52, 9 L. R. A. 501; *Chism* v. *Schiffer*, 51 N. J. L.; 12 L. R. A. 544; *Badger* v. *Karber*, 61 Ill. 328; *Williams* v. *Chicago, etc., R. Co.*, 112 Mo. 463; *Fowler* v. *Deakman*, 84 Ill. 130.

"When a contractor has valuable property rights and pecuniary interests depending upon the discretion, judgment good faith of two individual architects, he has the *legal right* that each shall ascertain the facts in the case and examine the premises personally, where an examination is necessary as in this case, and not rely wholly upon the judgment of the other architect." *Benson* v. *Miller*, 56 Minn. 410.

With the aforegoing principle in mind and the overwhelming weight of the evidence supplemented by the admissions of the architect himself, showing that the general condemnation of the entire building was unjustified, it is abundantly clear that the failure of the architects to give certificates for payment and to approve the bills for extra work, is no bar to the appellee's recovery if the Court believe that appellee has in this case done work for the appellants which in justice and right entitles the former to compensation.

With respect to the contention as to the necessity for a presentation of the bills for extra or additional work and the excuse now made, that they could not have been approved if presented, it is sufficient to say that it is a general principle of law that a party will not be required to do a nugatory act, and that where one person refuses in advance to do a certain thing, there is no obligation to ask him to do it. This principle is recognized in cases where a tender is required. If a party says in advance that he will not accept the tender if made, the actual making of the tender becomes unnecessary.

At the argument below, much stress was laid upon the fact that in the building as it was finally completed by the appellee, there existed a number of material imperfections and deviations from the plans and specifications, most of which went to the usefulness of the structure, and some of them even affecting its safety. In every such case counsel below charged that the full responsibility for these defects was upon the contractor, inasmuch as the contractor had obligated itself to erect the building in conformity to the plans and specifications and must be held responsible for any and all defects in the building as finally completed.

But while we admit that such might be the rule in ordinary cases, we contend that such rule is not applicable in the case at bar, for two very obvious reasons:

*First.* Because certain of the more serious defects arose because of defects in the plans and specifications themselves, or because uusuitable materials were specified, it being a well-recognized principle that where work is done in accordance with directions or specifications, the contractor cannot be held responsible for defects which may subsequently develop in said work; and

*Second.* Because by the terms of the contract itself the work was to be done under the direction of the architect, whose decision of the true construction of the drawings and specifications was made final, who had the power to condemn and require the removal of unsound or improper portions of the work as the same progressed, and who, finally, was given continu-

ing control over the work by the provision that payments should be- made only upon his estimate of the work performed and material in place in the building at stipulated times, and because, having such sweeping control over the work the architect stood by, and for the sake of having the work completed as speedily as possible, virtually assented to many of these deviations from the plans and specifications and allowed them to continue until it was too late to rectify them, subsequently making these- very deviations his ground for a wholesale condemnation of the entire building.    We contend that under such circumstances the owner is estopped from substituting the architect's final disapproval of these things for the approval which he had tacitly given them by standing by and allowing them to go on while the' work was under his direction and when they might readily have been corrected.

The principles enunciated in the two preceding paragraphs are fully sustained by the authorities.

. Contract to build a reservoir. Specifications to be followed but no covenants as to results.    Held if contractor followed specifications he may recover, although reservoir not watertight.    *Harlow* v. *Homstead*, 194 Pa. 57; *Filbert* v. *Philadelphia*, 181 Pa. 545.    Bridge worthless but built according to plans.    Held that contractor was entitled to recover.    *Holland* v. *Union Co.*, 68 Iowa, 56.    Tunnel built according to specifications but arch fell.    Held that contractor could recover.    *Byron* v. *N. Y. City*, 22 Jones, S. 411.    Construction of wing to State capitol according to plans furnished by State and its architect.    After a large part so constructed and accepted it fell owing to defects in plans.    Contractors recovered cost of rebuilding.    *Bentley* v. *State*, 73 Wis. 416.

Case of building a dam.    If defendant designated rock and gravel and this proved insufficient, contractor might recover for full performance nevertheless.    *McKee* v. *Brandon*, 3 Ill. 339.    Inferior sand designated by owner for use in mortar, and walls found defective.    Held that owner was not entitled to deduct damages.    *McLane* v. *DeLeyer*, 56 N. Y. 619. Subcontractor, by arrangement with architect, used inferior mate-

rials in plaster.   Contractor was absolved from responsibility
for bad results.   *Robinson* v. *Baird*, 165 Pa. St. 505.   Defec-
tive material furnished by owner.   He is bound by results.
*True* v. *Bryant*, 32 N. H. 241.    A particular stone was speci-
fied.    Afterward, when the stone discolored, the superintend-
ent rejected it and refused certificate.    Held that this was bad
faith and the contractor might recover.    *Badger* v. *Kerber*, 61
Ill. 328.

The application of the principle of estoppel in cases of this
character is also well recognized.

Under a contract providing that the building was subject to
the approval of the architect or engineer, the engineer cannot,
after approving the material, withdraw his approval.   *Jones* v.
*Gilchrist* (Texas Civil App.), 27 S. W. 890.

When an architect stood by and saw defective material being
used, and knowing the character and not objecting at the
time, it was held that such conduct was an approval of such
material.    *Wright* v. *Mayor* (Texas Civil App.) 25 S. W.
1122.   See also *Kane* v. *Stone Co.*, 39 Ohio St. 1; *Union
Stove Works* v. *Armour*, 7 Misc. Rep. 700.

A large portion of the delay in the completion of the build-
ing was attributable to the owner in requiring the appellee to
do more than it had undertaken to do, that a material portion
of it was due to the failure of the architect to furnish the de-
tails as required, and that the whole of the delay since about
September 22nd, 1904, is attributable wholly to the owner's
unjustifiable refusal to accept the building, or pay anything
on account thereof.    In fact the interview between the attor-
neys for the parties which occurred several days after Septem-
ber 20th, was an absolute refusal on the part of the owners to
pay anything on account of what had been done or to come
to any terms as to what should be done by the appellee to
complete the building to the satisfaction of the architects—a
virtual rescission of the whole contract.    *Holme* v. *Guppy*, 3
M. & W. 387; *Weeks* v. *Little*, 89 N. Y. 566; *Dannet* v.
*Fuller*, 120 N. Y. 554; *White* v. *School District*, 159 Pa. 201.

It is a well recognized principle in cases of this character

where contracts contain a time stipulation and the owner adds to the undertaking by requiring alterations or additional work, that the agreement on the part of the contractor to complete it by the date specified is thereby waived, and that the owner is not entitled to damages for delay.

A party cannot take advantage of non-performance of a condition if he himself causes it. "Taking the old and the new work together, Duggerty never agreed to perform the work within the time specified in the contract." *Smith v. Duggerty*, 4 Barb. 614.

In a case where the specifications were departed from, it was held that such departure varies the contract and leaves the obligation to complete the work in a reasonable time. *Green v. Haynes*, 1 Hilt, 254; *Van Buskirk v. Stowe*, 42 Barb. 9; *Sweeney v. Davidson*, 68 Ia. 386; *Westwood v. Secretary of State*, 7 Law Times Rep. (N. S.) 736.

In *Focht v. Rosenbaum*, 176 Pa. St. 14, the building contract provided "no order for any change which affects the time of completion shall be valid unless given in writing." Also contains stipulation for $10 for each day's delay over the time limited. The owner gave a parol order to change the girder in the building which was complied with and delay resulted. It was held that the owner could not profit by his failure to write out the order, the order not being disputed.

In *Russell v. Viscount De Bandeira*, 13 C. B. (N. S.) 149–202, delay was caused by orders for extras. Under the contract extras could be recovered for only when order in writing. The order for these extras was not in writing and therefore there was no recovery. But that fact was held by the Court not to affect the question of delay, and stipulated damages were held waived by the necessity of delay beyond the time limited. This was held notwithstanding a provision in the contract for extension in time if contractor delayed by cause not under his control, except when certified in writing. The Court held that the contract so made impossible of performance by the act of the owner himself, and he could not take advantage of his own act or wrong.

In the leading case of *Thornhill* v. *Neats*, 8 C. B. (N. S.) 831, (1860), the Court said: "It is solely for the employer's benefit that the provision is made requiring the contract work to be completed by a specified date.    He may waive that provision and he must be regarded as having done so when he or his authorized agent exercises his option to order extra work in such a manner as to leave the contractor only the choice of alternatives of failing in the fulfilment of that provision or of completing the extra work sooner than he bound himself to do."

In *Cornish* v. *Snydarn*, 99 Ala. 620, there was a contract to complete a house in 60 days and the contractor was subsequently required to finish the second story not required in the specifications.    It was held that the time stipulation was waived and that the contract substituted therefor was that the work should be done in a reasonable time.    See also *Bigelow* v. *N. Y., &c. Trans. Co.*, 52 Hun. 613; *Doyle* v. *Halpin*, 1 J. & S. 352; *Fannhorn* v. *Roso*, 2 Hill (N. Y.) 172; *U. S.* v. *Peck*, 102 U. S. 64; *Van Buskirk* v. *Stowe*, 42 Barb. 9; *Palmer* v. *Stockwell*, 9 Gray, 237.

PEARCE, J., delivered the opinion of the Court.

This is an appeal from a decree of the Circuit Court for Baltimore County as a Court of equity, establishing a mechanics' lien for the sum of $68,542.62, with interest on $53,542.62 from November 29th, 1904, for the erection of a certain school building upon a tract of land near Glencoe Station, in Baltimore County, and ordering a sale of said building, together with twelve hundred and ninety three acres of adjacent land belonging to the owner of said building, for the payment of said lien.    The case involves a very considerable amount of money. The record is voluminous, covering 1650 printed pages; eminent counsel have appeared on both sides, and numerous questions have been raised, that as to the extent of the mechanics lien for the construction of buildings upon farming lands, and to be used for farming purposes being for the first time before us.    The statute being the same in all cases however, the

amount involved cannot alter, or control the application of the legal principles to be applied.

The bill states that the plaintiff, a corporation under the laws of Pennsylvania, being a contractor and builder, entered into a contract on June 10th, 1904, with the defendants, Henry D. Perky, and the Filston Farm Company, a corporation under the laws of Maryland, to furnish the materials and labor required for the erection of a large building or two connected buildings, designed for use as a school of agriculture and other pursuits, "to be maintained by and upon tracts of land located in the Tenth District of Baltimore County," and that there was then due the plaintiff for such material, work and labor, the sum of $77,307.46.

That the said Perky and the Filston Farm Company were, at the beginning of the said work and labor, and the furnishing of said materials, the owners of all the lands intended to be used for said school, including the land actually covered by said building or buildings.

That part of said land so owned had been conveyed before said contract to one George C. Weddell of Philadelphia by sundry deeds from parties acting under the direction of said Perky and said Filston Farm Company, but that the purchase money was paid by them, and that said Weddell had no beneficial interest in said lands, and held the same in trust and at the pleasure of said Perky and said Filston Farm Company; and that other parts of said lands were conveyed by deed of mortgage by said Perky and said Filston Farm Company on October 22nd, 1904, to one Joseph Fels of Philadelphia, to secure an alleged indebtedness therein mentioned.

That on November 4th, 1904, said sum of $77,307.46 being then due and unpaid, the plaintiff filed in the Clerk's Office of the Circuit Court for Baltimore County "a claim for lien under and in accordance with the provisions of Article 63 of the Code of Public General Laws of Maryland, against the said building, the ground upon which it is erected and the land immediately adjacent thereto, belonging in like manner to the owners of said building or buildings, which is necessary

for the ordinary and useful purposes of said building or buildings and the convenient use of the same for the purpose for which the same was or were designed," and that said lien claim was filed therewith as Exhibit A.

The prayer of the bill was that the land so conveyed to Weddell should be declared to be held in trust for said Perky and for said Filston Farm Company, and be so brought within the whole tract of which it was alleged to be a part, and was intended to be devoted to the use and maintenance and convenience of said school building or buildings.

The lien claim filed described by metes and bounds a number of tracts of land containing in all about 1700 acres conveyed at different times and by different persons, some to said Perky and said Filston Farm Company and some to said Weddell, by ten distinct conveyances, some of which embraced several distinct tracts or parcels of land. The amount claimed is thus stated:

| | | |
|---|---:|---:|
| Total price of original contract:— | | $64,357.00 |
| Amount of extras,— | | 27,372.46 |
| | | $91,729.46 |
| Credits July 11, 1904, | $1,833.44 | |
| Credits Aug. 11, 1904, | 12,588.56 | 14,422.00 |
| | | $77,307.46 |

But no copy of the contract was filed with the bill, nor were its provisions set forth or referred to therein.

The defendants Perky and the Filston Farm, filed a joint answer accompanied by a copy of the contract. The answer denied that the sum claimed, or any other sum whatever, was due under the terms of said contract, and alleged that the Filston Farm was at the time of the execution of the contract, and still continued to be, the sole owner of the land upon which said buildings stand and of all the other land immediately adjacent thereto, and necessary for the ordinary and useful purpose thereof; also that one of said other tracts attempted to be included in said lien was used as a residence by Mr. Perky, and the remainder were used for farming and

stock raising, a portion being in timber, and were so intended to be used. It admitted that Weddell had no substantial interest in the property conveyed to him as alleged in the bill, and declared that it was purchased by Perky and wholly paid for by him and had since been conveyed to him by said Weddell, and that they were purchased to be used in connection with other buildings designed to be erected on one of said tracts near the line of the railroad, at a point distant more than one mile from the building erected by the plaintiff. It alleged that the mortgage to Joseph Fels mentioned in the bill was made by the Filston Farm alone, of land belonging exclusively to it, and that it was made in good faith to secure an actual indebtedness. It alleged that the plaintiff had wholly failed to fulfill the terms of said contract, and charged that the buildings because of bad workmanship and improper materials done and provided by the plaintiff, were defective and unsafe, and could not be used for the purposes for which they were designed; that the plaintiff refused, after due notice by the architect under said contract, to make said work and materials conform to said contract, and stopped all work thereon on October 22nd, 1904, and since then had made no effort to complete the work as required by said contract. It alleged that the contract provided that payments should be made only on certificates of the architects, and that the architects had certified to the defendants that no money is due to the plaintiff by reason of faulty and unsafe construction, and that all certificates that were given by said architects had been promptly paid. It alleged with reference to the claim for extras that all bills for materials and labor were required to be approved by the architects, before any money should be due and payable therefor, and that no bills for any of such extras have ever been presented to or approved by said architects, and that a large part thereof is defective and improper and has been duly rejected by said architects, but the plaintiff has refused to make the same good.

The other defendants, Weddell and Fels, adopt this answer as their own.

The contract between the parties was the form of building contract approved and adopted by the Institute of Architects and the National Association of Builders, and in general use throughout the country, and it was designed to afford equal protection to builders and owners, and to minimize the hazard of litigation as far as possible.

The important provisions of this contract are the following:

Article 2 provides that all work is to be done under the direction of the architects named therein, Esenwein and Johnson, in conformity with their drawings and specifications as part of said contract, whose decision, in respect thereto is to be final between the parties.

Art. 3. No alterations to be made in the work except upon written order of the architect; the amount to be paid by the owner or to be allowed by the contractor to be stated in said order, or if not then agreed on, to be determined by arbitration as provided in Art. No. 12.

Art. 4. "The contractor shall at all times provide proper facilities for inspection of the work by the architects, and shall within twenty-four hours after written notice from the architects, remove from the ground and buildings all materials condemned by him, whether worked or unworked, and take down all portions of the work by written notice condemned as unsound or improper, or in anyway failing to conform to the specifications, and shall make good all work damaged or destroyed thereby."

Art. 5. If the contractor at any time refuse or neglect to supply sufficient skilled workmen, or materials of proper quality, or fail to prosecute the work with diligence, or fail in the performance of any agreement, such failure being certified by the architect, the owner, may, after three days written notice to the contractor, provide any such material and labor and deduct the cost from any money due or to become due to the contractor; or, if so determined by the architects, may terminate the employment of the contractor, enter upon the premises, and employ any other person to complete the work.

Art. 6 provides : "It is strictly understood that the build-

ings must be entirely completed ready for occupancy on the first day of September, 1904. The contractor agrees to pay the owner the sum of one hundred dollars for each day that the work shall remain unfinished after September 1st, 1904. Such payment is not to be as a penalty but as liquidated damages agreed upon by the parties hereto."

Art. 9. Fixes the sum to be paid for work and materials at $64,357, *such payment to be made only upon certificates* of the architects, and to be made upon the tenth day of each month for the work done in the preceding calendar month, as estimated by the architects, the owner to retain twenty per cent of the estimated value of each payment, until final settlement, and the certificate of the architects is to be final as to this clause of the contract. This article also provides that "certain additions, as per amended plans and specifications are to be made to the work provided in the original plans and specifications," the work of said additions to be done on a percentage basis, as provided in said article, and "*all bills* for material and labor are to be approved by the architects." "The final payment to be made within sixty days after the completion of the work included in this contract, *and all payments shall be due when certificates for the same are issued.*"

Art. 10 provides that no certificate given, or payment made, except the final certificate or final payment, shall be conclusive evidence of the performance of said contract, either wholly or in part, and that no payment shall be construed to be an acceptance of defective work or improper materials.

This contract bears date June 10th, 1904, but was not fully executed until several days later, as it was necessary to send it to Mr. Henderson who was then in St. Louis, for his signature, and the corner stone was laid June 17th, 1904.

For several years previous to the execution of this contract Mr. Perky owned and conducted in Worcester, Massachusetts, a school of domestic science for girls or women, and in 1904 purchased from the receiver of the Filston Farm Company for $157,000 all the stock of that corporation except a

few shares, intending to transfer said school to Maryland and
to erect school buildings upon some part of the land of the
Filston Farm Company, and to extend the system of instruc-
tion to boys.   The Filston Farm Company had conducted a
dairy business, and the property purchased by Perky from
the receiver included several tracts of land known as the
Upper Farm, The Meadow Farm, the Lower Farm and 109 acres
of timber land, in all 1,167 acres, and he subsequently pur-
chased from other parties other adjoining lands increasing his
holdings to about 1,700 acres.   The building erected by the
plaintiff stands upon the tract known as the "Lower Farm"
shown by the testimony to contain about 200 acres.   Mr.
Perky's plan and purpose was to open the school in Maryland
on October 3rd, 1904, and in order to ensure this, he required
the contract to provide for its complete execution and fulfill-
ment by September 1st, 1904.   The plaintiff's original bid for
this contract was $59,857, but it was so vital to Mr. Perky's
plans that there should be no delay in the completion of the
buildings by September 1st, that Mr. Esenwein the architect,
inquired of Mr. Swindells, who represented the plaintiff, if he
had figured on night work, as Esenwein thought the building
could not be completed by that time without night work.
Swindell said he had not done so, and he at once communicated
with plaintiff, and as a result the sum of $4,500 was added to
cover the cost of night work, thus raising the bid to $64,357.
Thereupon Mr. Perkey issued and distributed over the
country his catalogues providing for the opening of the
school to be known as the Oread Institute, on October 1st,
1904, and secured 65 pupils who were to pay $500 a piece
per annum, and these engagements he was obliged to cancel,
because of the non-completion of the building according to
the contract.   Mr. Perky testified that he paid $70,000 for
the Worcester property, and had spent $55,000 in improving
it and that it was absolutely unincumbered until the plaintiff
laid an attachment upon it after the litigation in this case be-
gan.   He also testified that he was president of the Natural
Food Company at Niagara, making the cereal known as

shredded wheat, and that he held $10,000 of the stock of that company paying regular annual interest of six per cent—and that he had $35,000 invested in a patented enterprise in Worcester, a paper company, the foreign patents for which had been recently sold for $300,000 of which $100,000 was in cash and the balance in stock; also that he had paid for, and then owned 250 head of cattle and other personal property on the farm unincumbered, besides some other stocks. It is quite clear therefore, that he was a man of independent means amply able to undertake such an enterprise, and to perform the contract in question on his part. There is evidence that Mr. Perky sometime in September, 1904, was not prepared with the necessary cash to carry out his plans, without realizing upon his property, but he states that if the building had been in conformity with the contract he would have been prepared to raise the necessary cash to pay every installment of the contract as certified, and Mr. Fels, a man of large financial means in Philadelphia, testifies that Mr. Perky in September, about the 21st, conferred with him in reference to a contemplated loan, that he investigated the situation, and that he and his brother were financially able and willing, and were prepared to lend him $80,000 or $90,000, and were prepared to see him through his building operations. Mr. Perky testifies that the establishment of his school was "the dream of his life," and when he went to Europe for his health in August, 1904, he gave to Mr. Dormon, his attorney, a power of attorney, authorizing him to raise money to pay all certificates issued in his absence. It is impossible therefore to find any justification for the non-completion of this building, in the inability of Mr. Perky to perform his contract as to payments. The contract was quite a large one to be executed in the time named, and it is evident that great expedition and good management were necessary on the part of the plaintiff to enable him to comply as to time, but he was an experienced builder, and his attention was called by the architect before the execution of the contract, to the architect's opinion that night work would be an absolute necessity to its completion, and $4,500 was added

to the bid—his own estimate of the additional cost of such night work. If, therefore, the time was in fact shorter than was prudent, that was a risk he took with open eyes, and constitutes no defence to him in law for failure to complete in time, nor can the fact that the rush required night work, and haste both day and night, constitute any defence for defective work or materials.

The rights of the parties must be determined by the terms of the contract by which they both advisedly bound themselves.

When the case came to a hearing, the Court, in the opinion delivered, held that under the conditions of the pleadings, much of the testimony taken would be inadmissible, and suggested such an amendment would be allowed as to cure the vague and general allegations without making out a new and different case and the bill was accordingly amended so as to charge that the architects "*wrongfully and without justification* failed and refused to make an estimate for the work and material put in place during the month of August preceding, and to give complainant a certificate for the payment of such work and material; whereupon complainant nevertheless proceeded with the erection of such building, and in good faith completed the same substantially as contracted for, save in certain relatively unimportant and minor variations and particulars, said default in respect thereto being unintentional on the part of the complainant, and the result of inadvertence on the part of its employees engaged in said work, and not being of a character materially to impair the usefulness or safety of such building or render it in any degree unfit for the purposes for which it was designed, and being susceptible of correction by the expenditure of relatively small sums of money for labor and material, or an allowance to the owner out of the contract price. But that the architects on September 20th, 1904, wrongfully and without justification condemned the whole work, and refused to accept the same in behalf of the defendants, and the defendants knowing the action of said architects to be wrongful and unjustifiable, did also refuse to accept and

pay for said building." This amendment was made *ex parte*
and without notice to defendants, who excepted thereto, but
their exceptions were overruled. The defendants then an-
swered the amended bill denying all its averments, and alleg-
ing that the architects in good faith, and in pursuance of the
duties imposed upon them by the contract, refused to make said
estimate and give said certificate, because of plaintiff's failure to
furnish proper materials and do proper work as required by
said contract, and had failed and refused to make the changes
in the work required by the architects in order to make said
building conform to the specifications, and therefore no sum or
sums of money were due under said contract in the judgment
of said architects; and the defendants acted in good faith in re-
liance upon the judgment of said architects; that the building
was not completed substantially as contracted, and was not fit
for the use for which it was intended, and could not be made
such without the expenditure of many thousands of dollars.

The defendants then asked leave to take additional testi-
mony, agreeing that the testimony already taken should be
considered as re-filed, after replication to amended answer, and
this leave was refused, and the Court proceeded to final decree
determining that there was due the plaintiff for work and labor
in erecting said building the sum of $53,542.62 with interest
from November 29th, 1904, and that upon correcting certain
defects in said building enumerated in the decree, subject to
the approval of said Court, the plaintiff would be entitled to
the further sum of $15,000 to be paid into Court as therein
provided within 30 days thereafter: also declaring that the
lien sought to be enforced should embrace and include 1293
acres of land described in the surveyors report to be mentioned
hereafter, and appointing trustees to sell said land.

Either party in equity upon application to the Court, has
the right to amend the pleadings at any time before final de-
cree upon payment of such costs as the Court may direct, so
as to bring the merits of the controversy fairly to trial. This
amendment was a most liberal; and indeed unusual allowance
of the exercise of that right, but it was plainly allowed with

the commendable purpose of avoiding further costly delay in this unfortunate litigation, and we cannot perceive that it made a new or different case—nor that any real injury has been worked to the defendants by the refusal to take additional testimony, and we shall not therefore question its allowance under the circumstances of this case.

The learned Judge of the Circuit Court in the course of the opinion filed says: "In view of the effort that has been made by both the parties litigant and their respective counsel all through the progress of the case to lay the blame and responsibility for the present unfortunate situation upon the opposite side, I deem it proper to say that there is no testimony whatever in the case directly pointing, *or from which the slightest inference can be drawn, that either of the parties, or any of their representatives, either in the preliminary negotiations, or in the consummation of the contract by its execution, acted otherwise than with the utmost good faith."* And in this view we fully agree, after a careful and laborious perusal of the testimony; but it is just here that we encounter the principal and most difficult question in the case.

This contract, and the work to be done under it, has been very properly denominated by the parties as a "rush contract" and "rush work," and the haste required in its performance may well explain much oversight in the preparation and use of defective material, and the inspection of work not up to the requirements of the contract, both by the plaintiff's employees and by the supervising architect.

But this contract provides, as we have seen, that payments are to be made only upon certificates of the architect, and that all payments shall be due only when certificates for the same are issued, and the Maryland cases are uniform in holding that such a provision makes the production of the certificate a condition precedent to the liability of the owner to pay for material and labor, unless its refusal is due to fraud or bad faith. It was so held in *Gill* v. *Vogeler,* 52 Md. 663; *Lynn* v. *B. & O. R. R.,* 60 Md. 404; *B. & O. R. R.* v. *Brydon,* 65 Md. 198; *Annapolis & Balt. Short Line R. R.* v. *Ross,* 68 Md

310, and *B. & O. R. R.* v. *Canton Co.*, 70 Md. 405.   A cita-
tion from a single one of these cases will suffice to show how
broadly and emphatically this doctrine has been stated.   In
*Lynn* v. *B. & O. R. R., supra*, JUDGE MILLER said: "By grant-
ing the fourth prayer the jury were instructed that it was not
sufficient for them to believe from the evidence that Legge
unreasonably rejected the ice unless they find that his action in
this respect was fraudulent or done in bad faith; and by the
fifth instruction they were told that it is not enough to estab-
lish the fraud charged, that they may believe from the evi-
dence that Legge rejected ice which *they* may believe from the
evidence he *ought* to have accepted, or that he rejected ice
which in *their* opinion, or that of *others*, corresponded in all
particulars with that described in the agreement.   *   *   *

While, as we have said, the condition precedent in this con-
tract will be dispensed with by proving that the judgment of
the agent to whom the parties entrusted the duty of inspection
and approval was the result of his fraud or *mala fides, it is
plain that nothing less will suffice.*   This is well illustrated by
*Clarke* v. *Watson*, 18 C. B. N. S. 278.   In that case there was
an agreement by which the plaintiffs contracted to do certain
works according to certain plans and specifications, and were to
be paid for the same upon the production of the certificate of the
defendant's surveyor that the contractors have duly and efficiently
performed and completed the work to his satisfaction.   The dec-
laration, to which there was a demurrer, averred that the
plaintiffs had done all things under the contract necessary to
entitle them to have this certificate of the surveyor, but that
he had wrongfully and improperly neglected and refused to
give the same.   The Court held that this was not sufficient.
ERLE, C. J., said: 'This is, in effect, an attempt on the part of
the plaintiffs to take from the defendants the protection of
their surveyor, and to substitute for it the opinion of a jury.
That is not the contract the defendants have entered into.
The allegations of the plaintiffs are not in my judgment, such
as to entitle them to succeed.'   *   *   *   So in the case be-
fore us, it was not enough that the jury might believe from

the evidence that Legge unreasonably rejected the ice, or that he was grossly wrong in his judgment as stated in the plaintiff's third prayer.    By this contract, which is perfectly lawful, the parties expressly agreed to submit the question whether the ice to be supplied was *good, clear and solid*, to the judgment of this third party, *and his judgment, no matter how erroneous or mistaken it may be, or how unreasonable it may appear to others, is conclusive between the parties, unless it be tainted with fraud or bad faith.*    To substitute for it the opinions and judgments of others, whether Judge, jury or witnesses, would be to annul the contract, and make another in its place."

The language of JUDGE ALVEY in *B. & O. R. R.* v. *Brydon*, 65 Md. 225, 226, is equally clear and emphatic, but we forbear from repeating it. ` The same law has been laid down by the Supreme Court of the United States in numerous cases such as *Kihlberg* v. *U. S.*, 97 U S. 398; *Sweeney* v. *U. S.*, 109 U. S. 618; *Martinsburg & Potomac R. R.* v. *March*, 114 U. S. 549; *U. S.* v. *Gleason*, 175 U. S. 588.    And in the recent case of *Dulaney* v. *Fidelity & Casualty Co.*, ante p. 17, this Court said: "Under the repeated decisions of this Court the policy must, like other contracts, be construed according to the sense and meaning of the language in which the parties have seen fit to express themselves, and they must abide by that language, even though its selection turn out to have been unwise or unfortunate."

But after a thorough reading and careful consideration of all the testimony, we are forced to the conclusion that this case cannot be justly and properly determined by applying that doctrine and dismissing the bill.    In *Lynn* v. *B. & O. R. R.*, *supra*, the Court said: "There are several modes in which the performance of a condition precedent may be dispensed with, which the case does not require us to notice."    One of these modes is by waiver or estoppel, and that is a question which the peculiar circumstances of this case does require us to consider.

It would be impossible within the limits of any opinion of reasonable length, to review, or even refer to all the testimony

bearing upon this question, and we can only summarize its results with occasional reference to details.   The principal matters of complaint by the architect were the mortar used in the erection of the wall—the piers under the auditorium—the interior plastering, and portions of the flooring and interior wood work.   As we have said, this was a "rush contract," known to be necessarily so by both parties, and this fact required unusually close and careful supervision by the architect, who, while the agent of both parties, was more especially the representative of the owner.   It was work which required his constant presence and close attention, either in person or by some competent subordinate, in order that prompt and effective objection might be made to any defective material or poor workmanship, as the work progressed and in order that such defective material be taken out and replaced with proper material, and such inferior work be made good at once, without waiting until the building was nearly completed, when the cost of such correction would be so largely increased.   This degree of close and constant supervision does not seem to been given by Mr. Esenwein personally, and his representative, Mr. Thompson, though constantly on the spot and frequently remonstrating with Mr. McQuade, plaintiff's superintendent, about matters as to which they differed, did not apparently require or suggest to Mr. McQuade any peremptory removal of material or renewal of work, until at or about the 10th of September when the estimate of the August work was called for Mr. Thompson refused to make that estimate as he states, because of his quarrel with McQuade, and the latter's improper refusal to recognize him in the matter, and Esenwein, for that reason was notified he would personally have to make the estimate.   Mr. Esenwein admitted that Thompson had changed the specifications as to mortar, by changing it from "cement mortar with lime as directed," to "lime mortar with cement as directed," and this change must necessarily have had the effect of contributing to the failure of the mortar to harden as the architect desired, and to the continuing softness of which he complained, though he did not until September 20th, when

the building was approaching completion, condemn the mortar and the walls and piers in the erection of which it was used, and in his testimony in relation to these piers, he withdrew his condemnation of them, and said "I wish very much to modify some of the expressions of that letter." It is quite plain we think from all the testimony of Mr. Esenwein that while he was not fully satisfied with this mortar, he allowed it to go in as the work progressed, relying upon the assurance of Mr. Swindell and the foreman that it would harden in due time.

The plastering was going on for a considerable time, and if it was as inferior as the testimony of all the witnesses makes it appear, the inferiority whether due its mixing or composition, or to the method of its application, ought to have been discovered by the architect either during the mixing or when the application was under way, and it should *then* have been condemned, and its use ordered discontinued. There can be no doubt from all the testimony that this part of the work was wretchedly poor from the beginning, but that fact serves to emphasize the necessity of prompt rejection as soon as there was opportunity for discovery of its character.

Mr. Esenwein also admitted that he passed some wood work which they would not have passed except for the fact that he wanted the work rushed, and said "I admit I was wrong about the wood work, but as it is now I admit it is a fairly good job, and I would accept most of it."

He also admitted that after making allowance for defects existing September 10th, a considerable sum would have been due the plaintiff, and that he came to the premises at that time, intending to make the estimate, and that he did not then intend to refuse all payment or payments and that he made his letter of September 20th a wholesale condemnation because he thought all the matters in dispute would go to arbitration, and thus no removal or correction of work would be required, but he subsequently learned such arbitration was not permissible under the contract.

We have said before, and we now repeat, that the evidence

shows that Mr. Perky was financially responsible to respond to all liability under this contract, but it also appears that he became temporarily embarrassed and in need of cash about September 10th, and it also appears from the testimony of Mr. Bond that at the interview of September 20th with Mr. Perky and Mr. Dorman the only subject of conference was the financial embarrassment of Mr. Perky, and the best way to protect all parties by a receivership or some other plan which would tide over the difficulties, and that it was not until the subsequent receipt of the letter of condemnation of September 20th that he had any knowledge of the situation in that respect.

In view of all these circumstances we are of opinion that the production of the architect's certificate must be regarded as waived, and the owner as estopped to deny the acceptance of the work and material objected to, but without prejudice to a proper allowance for any inferiority in the materials or work so accepted; and without going into a consideration of the general principles which underlie the doctrine of substantial performance, we are of opinion this is a case where its application may be permitted, *Orem* v. *Keelty*, 85 Md. 337.

This brings us to the question of the extent of the lien, for if there is no lien, there could be no relief in this proceeding.

Upon the application of defendants, under sections 6 and 7 of Art. 63 of the Code, the Court ordered Col. Charles. B. McLean, County Surveyor, to designate and describe by metes and bounds the extent of ground necessary for the convenient use of said buildings for the purposes for which they were designed, with power and leave to hear such testimony as the parties may wish to adduce on the question of the purposes for which the buildings referred to were designed, and he filed the report heretofore mentioned—describing the several tracts containing 1293 acres of land he "believed should attach to the Oread Institute for the purpose for which it was designed." No action was taken upon this report until the passage of the decree appealed from, in and by which said report was approved and the land described therein was declared subject to the lien for the indebtedness established by that decree. Sec.

7 of Art 63 provides that such report shall be entered at length upon the Mechanics' Lien Docket, and if approved by the Court shall be conclusive upon all persons concerned, and the appellee now contends "that the action of the Court in approving the surveyor's report, in fulfillment of its function in this special jurisdiction is not reviewable."

Whatever might be the construction to be given to secs. 6 and 7, if that report had been made in a separate proceeding, and it had been approved by a special order for that purpose, in such proceedings we are not called on to consider.    But we have no such proceeding here.    The petition for designation of boundaries was filed in the pending proceeding to enforce the statutory lien, and as part of that proceeding.    It was never disposed of or acted upon in any manner until the final decree disposing of the entire case.

This being so, and that decree as an entirety being subject to appeal, we think everything for the first time disposed of by it ought to be open for review on appeal.    It may well be doubted whether the purpose of the Legislature in enacting that law was to confer upon the surveyor, without the intervention of a jury, and without the right of appeal, the judicial power to determine the question here raised.    It would seem to be more probable that it was only designed to give him authority to designate the boundaries of such parcels of land as are admittedly subject to a lien, and to make that designation "obligatory upon all persons concerned," as expressed in sec. 5, where the owner files boundaries designated by him, and "conclusive upon all persons concerned" as expressed in sec. 7, having special reference thereby to persons acquiring liens subsequently to the commencement of the building, or previously acquired but not recorded before the commencement of the building, as provided in sec. 15 of Art. 63.

The appellee's argument in support of this unprecedent extension of the lien is founded primarily upon the fact that Mr. Perky drove Mr. Baton over nearly all this land, and told him it was all "to be used in connection with the school," and upon Mr. Baton's declared understanding that the plaintiff was to

have a lien on the whole; and he relies also and chiefly upon the case of *Lindsay* v. *Gunning*, 59 Conn. 296, 11 L. R. A. 552, and some cases cited in a foot note in 11 L. R. A. 552, as holding that such statutes should be liberally construed in favor of builders.

As to the first ground, we need only say that the driving over the property may be fully and satisfactorily explained as designed merely to show the amount and apparent value of the real property held by Perky, as indicative of his general financial resposibility, without adopting so violent a presumption as that he intended to promise a mechanics' lien on the whole. It is to be observed also that in defining the lien in sec. 4 of Art. 63 it is provided that it "shall extend to the ground covered by such building and to so much other ground immediately adjacent thereto  *  *  *  as may be necessary for the ordinary and useful purposes of such building," without adding the words, "for which it was designed," found in sec. 7. But giving these last words full effect we think the word "designed" as there used may be properly understood as equivalent to "adapted." The building in question may be adapted to a number of uses as fully as to the particular use for which Mr. Perky intended it when he let this contract. In all probability in view of his death, it will never be used for the purpose for which he intended it, but must be put to some other use for which it is adapted, and the extent of the lien should be determined by the ordinary and probable uses to which it will be put. Mr. Perky intended to use the building for a school of Domestic Science and Agriculture which he says he knew would not be self supporting, but which he, as a philanthropist, wished to establish, and he designed the immense area of farming lands which he purchased adjoining, to provide the necessary financial revenue for the support of the school.

Upon this common sense view the cases of *Tunis* v. *Lakeport Agr. Assn.*, 98 Cal. 285, and *Cowan* v. *Griffith*, 108 Cal. 225, were decided.

In the former case the builder of a club-house and saloon

erected upon fair grounds of 60 acres, with training stables and grand stand, claimed a lien on the whole tract under a statute giving a lien on the building "together with a convenient space about the same, or such as may be required for the convenient use and occupation thereof, to be determined by the Court on rendering judgment."

The lien was not allowed to embrace any of the other buildings—but was restricted to the meaning of the statute, the Court saying, "A flouring mill erected upon a large ranch would require a given space around it for the purposes incidental to its operation; it might require the whole ranch to create business for it, but it would not follow under our statute that the entire ranch would be subject to a lien for its erection." In the latter case the lien was claimed on a house and 40 acres five miles from Fresno, and in denying the lien the Court said, "the statute means just what it says. It does not contemplate that enough land should be set apart to support the owners." In *Girard Storage Co.* v. *Southwark Foundry Co.*, 105 Pa. St. 248, it was held that "where materials are furnished to one or more of several buildings upon a large tract of land used together in the general business of a private corporation, a mechanics' lien may be filed against the particular building or buildings only to which the materials were supplied, and the lot and curtilage appurtenant thereto," and the Court said, "we do not believe that a lien so general in its character as to embrace many buildings and 130 acres could be sustained." See also *Holland* v. *McCarty*, 24 Mo. App. 82. In *Edwards* v. *Derrickson*, 28 N. f. L. 39, cited by the appellee, the whole tract contained 52 acres. It was a mill seat with dwelling, mill and two houses occupied by employees of the mill, and the lien was extended to the whole, it having been for 30 years known and conveyed as one property. The Court said, "It is not so much the size of the lot or curtilage (spoken of in that statute) as whether it is one single parcel lying together, known as one tract, and bought and sold as such, its metes and bounds being generally known, the owners when bought and sold always recognizing one set of metes and bounds, and never making any other."

In *Lindsay* v. *Gunning, supra,* the lien was held to cover 350 acres which though made up of several tracts had been combined into one tract by the removal of the former division fences. The houses on the several parcels were also to be removed so as to destroy their former identity and create a new unit of holding, and new and extensive buildings were erected for a dairy farm which required a large area for its successful operation. In maintaining the lien the Court said: "The case is an extreme one." The present case is much more extreme without the features which induced the Connecticut Court to sustain the lien. Here the 1293 acres embrace a number of separate tracts each with its own original dwelling and appropriate out buildings still occupied for farming purposes, and the old boundaries and fences are still maintained. In the Connecticut case, the new buildings were central to the combined tracts, and superseded the former buildings.

Here the school building was erected in one corner of the whole tract, and upon an existing sub-division known as the Lower Farm containing, according to the testimony, about 200 acres. This is a larger area than is usually regarded as necessary according to the testimony for farm or agricultural schools, a number of which are mentioned by Mr. Dorman as having from 100 to 200 acres, and the Md. Agricultural College, a State institution, it is stated has about 300 acres.

Our conclusion is that the lien established by the decree cannot be properly sustained and that it should be restricted to the Lower Farm mentioned above as containing about 200 acres. The boundaries of this tract can be defined and establised by the decree to be passed when the case is remanded as it must be in view of our conclusion.

The testimony in this case was taken in open Court, and the opinion filed gives evidence that it was thoroughly reviewed and weighed by the learned and careful Judge who heard the case. He found the value of the extra work done under the ten per cent commission clause of the contract to be $23,107.62, and we adopt this finding. As the architect stated in his testimony that he would not after his letter of condemnation of

September 20th, have given a certificate for any of this work, it would have been idle to demand it, and the failure to produce it can constitute no bar to recovery for such extra work and we adopt this finding also.   The Court also allowed the defendants a credit of $4,500 as liquidated damages for delay in completion of the building by September 1st, being at the rate of $100 per day as stipulated in the contract, and for forty-five working days which the Court found would have been sufficient for the purpose.   But this estimate makes no allowance for any delay in obtaining a new contractor, or in assembling the men and materials for the work.   Some delay on this account must necessarily have occurred, and that consideration should not be omitted.   We think two weeks reasonable for that purpose, and our conclusion is that the time allowed should be 60 instead of 45 days, thus increasing that credit from $4,500 to $6,000.

The Court reached the present indebtedness, as ascertained by the decree in this way.

The contract price for the building was................................. $64,357
To this was added the ascertained value of the extra work....   23,107 62

$87,464 62
From this was deducted the amt. of the July and August certificates paid.............. ...... ......................................... 14,422 00

$73,042 62
From this again was deducted allowance for delay.. $ 4,500
Also an amt. reserved by the decree to ensure the
    correction of certain defects enumerated in the
    decree........... ........ ..................................  15,000

19,500 00

Leaving as the present amt. due.. ............................ ......... $53,542 62
which the decree requires to be paid with interest from November 29th, 1904, when the bill was filed.   The decree also provides that the defendants shall pay into Court within 30 days from its date the sum of $15,000 to secure the correction of the defects enumerated in the decree, subject to the approval of the Court, and which sum the decree says the plaintiff will then be entitled to receive.

We cannot agree with the two last-mentioned provisions of the decree. The Court in its opinion, after reciting the various defects disclosed by the evidence thus characterizes the conduct of the plaintiffs: "Instead of undertaking to remedy these matters of their own motion, they sat still, doing nothing, bring suit, and have the Court to unravel as best it can the tangled webb they are in a measure responsible for. Having so acted, they must take and suffer all the consequences necessarily resulting from their arbitrary conduct."

Interest is allowed on judgments and decrees, as damages, and in view of the conduct of the plaintiffs so well described in the passage quoted from the Court's opinion, we do not think they should be allowed interest as provided by the decree.

In reference to the $15,000 required to be paid into Court for the purposes, mentioned, we think it would be a hardship to require the defendants to pay so large a sum into Court to protect the plaintiffs against the consequences of their own default as found by the Court. Moreover, this course would in all probability result exclusively to the benefit of some third person as purchaser of the property. Mr. Perky's death makes it very improbable that any of his heirs or representatives will desire to carry out his scheme, or to become purchasers of the property for any purpose, and in that event the only way in which the defendants or Mr. Perky's estate can receive any benefit from the correction of the defects indicated is by allowing now as an absolute credit whatever the testimony shows it will cost to correct the same. All experience shows that costly improvements add comparatively little to the selling value of country lands—and the correction of these defects cannot be expected to add anything to the price that may be obtained at a sale under this decree. But if the cost of these corrections is allowed now as a credit, Mr. Perky's representatives if they should desire to bid upon the property and should become its purchaser, can elect whether they will complete the work under the direction of a builder and architect of their own selection, or convert the property to

some other use as they may deem most advantageous to them. We have a satisfactory standard for the allowance of such a credit in the sworn report of Mr. J. A. Dempwolf, a disinterested and competent architect, and his testimony before the Court, in which he says that all the defects required by the Court to be corrected can be corrected at a cost of $5,365.00. Mr. Dempwolf was appointed by the Court for this purpose, with the assent or at least without the objection of the parties; and we know of no better guide in the matter, than the opinion of a disinterested and competent architect, whose conclusion has not been seriously questioned, and we think the amount he states should be allowed as an absolute credit, and the whole matter be closed by the decree to be passed.

The matter will then stand thus:

| | |
|---|---:|
| Contract price........................................................................ | $64,357 00 |
| Extra work done................................................................... | 23,107 62 |
| | $87,464 62 |
| Credit amount of July and August certificates paid................. | 14,422 00 |
| | $73,042 62 |
| Deduct allowance for time of delay 60 days.............. $6,000 | |
| Deduct amount required to correct defect as per report of Dempwolf..................................... .............. 5,365 | $11,365 00 |
| Total amount of indebtedness......................... | $61.677 62 |

To be allowed without interest except from date of decree. We approve the provision of the decree that the plaintiff and defendants pay their own costs respectively.

> *Decree affirmed in part and reversed in part and cause remanded, that a new decree may be passed in conformity with these views; the plaintiffs and the defendants both in No. 12 and No. 13 to pay their own costs respectively above and below.*